# LISENBA *v.* CALIFORNIA.

Nos. 4 and 5.   Reargued October 14, 15, 1941.—Decided December 8, 1941.

*Mr. Morris Lavine* for petitioner.

*Messrs. Everett W. Mattoon,* Assistant Attorney General of California, and *Eugene D. Williams,* with whom *Messrs. Earl Warren,* Attorney General, and *Frank Richards,* Deputy Attorney General, were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The petitioner was convicted of murder, and sentenced to death, in the Superior Court of California for Los Angeles County. The Supreme Court of California affirmed the judgment March 21, 1939, two judges dissenting.[1] A rehearing was granted, the case was reargued and, October 5, 1939, the decision was reaffirmed and the former opinion adopted and amplified, two justices dissenting.[2] No question arising under the Constitution of the United States had been raised or decided. In a second petition for rehearing, the petitioner, for the first time, asserted that his conviction violated the Fourteenth Amendment. November 3, 1939, the Court ruled: "The petition for a rehearing herein is denied."

The Chief Justice of the State allowed an appeal, November 6, 1939, and, November 8, 1939, executed a certificate in which he enumerated the constitutional questions presented by the second petition for rehearing; stated that the court entertained the petition, and explicitly overruled each of the contentions made therein; certified

[1] 89 P. 2d 39.
[2] 14 Cal. 2d 403, 94 P. 2d 569.

that the decision denying rehearing "is to be interpreted and considered as holding against the appellant's contention that his rights under the Fourteenth Amendment to the Constitution of the United States . . . were violated"; and concluded: "It is ordered that this certificate be filed in this court and made a part of the record on appeal to the Supreme Court of the United States." On the record so made, this Court has jurisdiction to review the judgment.[3]

The appellant did not draw in question the constitutional validity of any statute of California. We, therefore, dismissed the appeal [4] but, treating the papers as a petition for certiorari,[5] we granted the writ. This case is No. 4.

October 31, 1939, the petitioner prayed the Supreme Court of California for a writ of *habeas corpus* on the theory that his trial and conviction had deprived him of his life without due process. He submitted affidavits of one Hope, who had turned state's evidence against him. In these, Hope asserted that his testimony was false, had been coerced by threats, and induced by promises of leniency and by fraud.

November 9, 1939, *habeas corpus* was denied, without prejudice. The Chief Justice of California allowed an appeal and made, and ordered filed of record, a certificate respecting the constitutional questions presented and decided by the court, similar to that entered in No. 4. We followed the same course as in No. 4, and the case is here as No. 5.

The appeals were presented *in forma pauperis*. The typewritten record is of great length. In the belief that

---

[3] *Roby* v. *Colehour*, 146 U. S. 153; *Gulf & Ship Island R. Co.* v. *Hewes*, 183 U. S. 66; *Whitney* v. *California*, 274 U. S. 357; *Honeyman* v. *Hanan*, 300 U. S. 14.

[4] Judicial Code § 237, as amended; 28 U. S. C. § 344 (a).

[5] Judicial Code § 237, as amended; 28 U. S. C. § 344 (c).

only by briefs and oral argument, and on a record printed by the court, could proper consideration and decision be had of certain apparently important questions presented, we issued the writs. The cases were argued at the October 1940 term, and the judgments were affirmed by a divided Court. A petition for rehearing before a full Court was granted, the affirmances set aside, and the causes set for rehearing at this term.[6]

The petitioner, who used, and was commonly known by, the name of Robert S. James (and will be so called), and one Hope were indicted, May 6, 1936, for the murder of James' wife on August 5, 1935. Hope pleaded guilty and was sentenced to life imprisonment. James pleaded not guilty, was tried, convicted, and sentenced to death. The trial was a long one in which the petitioner made objections to rulings and to the charge, which raise questions of state law decided by the opinion below, with which we have no concern. We shall refer only to so much of the evidence as bears upon the constitutional questions open here.

The State's theory is that the petitioner conceived the plan of marrying, insuring his wife's life by policies providing double indemnity for accidental death, killing her in a manner to give the appearance of accident, and collecting double indemnity.

James employed Mary E. Busch as a manicurist in his barber shop in March, 1935, and, about a month later, went through a marriage ceremony with her, which was not legal, as he then had a living wife. While they were affianced, insurance was negotiated on her life, with James as beneficiary. Upon the annulment of the earlier marriage, a lawful ceremony was performed. The petitioner made sure that the policies were not annulled by the fact that, when they were issued, Mary had not been his lawful wife.

---

[6] 313 U. S. 537. 597.

The allegation is that James enlisted one Hope in a conspiracy to do away with Mary and collect and divide the insurance on her life. Hope testified that, at James' instigation, he procured rattlesnakes which were to bite and kill Mary; that they appeared not to be sufficiently venomous for the purpose, but he ultimately purchased others and delivered them to James; that James, on August 4, 1935, blindfolded his wife's eyes, tied her to a table, had Hope bring one of the snakes into the room, and caused the reptile to bite her foot; that, during the night, James told Hope the bite did not have the desired effect; and, in the early morning of August 5, he told Hope that he was going to drown his wife; that later he said to Hope, "That is that"; and still later, at his request, Hope aided him in carrying the body to the yard, and James placed the body face down at the edge of a fish pond with the head and shoulders in the water.

James was at his barber shop on August 5. On that evening he took two friends home for dinner. When they arrived the house was dark and empty, and, upon a search of the grounds, his wife's body was found in the position indicated. An autopsy showed the lungs were almost filled with water. The left great toe showed a puncture and the left leg was greatly swollen and almost black. Nothing came of the investigation of the death.

James attempted to collect double indemnity; the insurers refused to pay; suits were instituted and one of them settled. As a result of this activity, a fresh investigation of Mary James' death was instituted. On April 19, 1936, officers arrested James for the crime of incest. He was booked on this charge on the morning of April 21, was given a hearing and remanded to jail. On May 2 and 3 he made statements respecting his wife's death to the prosecuting officials.

At the trial, in addition to that of Hope, testimony was adduced as to the finding and condition of the body, other

evidence to connect James with the death, and expert testimony that the condition of the left leg could be attributed to rattlesnake bites. The purchase of snakes by Hope was proved by him and several other witnesses, one of whom said he sold the two snakes to Hope, one of which, Hope claimed, had bitten Mary James. Two snakes were brought into court, which the witness identified as those sold to Hope and by Hope resold to the witness.

James' statements were offered in evidence. Objection was made that they were not voluntary. Before they were admitted the trial judge heard testimony offered by the State and the defendant on that issue. He ruled that the confessions were admissible, and they were received in evidence.

The State offered evidence with respect to the death of a former wife of James, in 1932. This tended to prove that, while driving down Pike's Peak, their automobile went off the road. James went for aid. When the persons called upon reached the automobile they found James' wife lying partly outside the car with her head badly crushed and a bloody hammer in the back of the car. James appeared unhurt. The woman recovered from her injuries, but, shortly afterwards, was discovered, by James and another man, drowned in the bathtub in a house James had temporarily leased at Colorado Springs. James collected double indemnity from insurance companies for her death, the insurance having been placed at about the time he married her and her death having occurred within a few months thereafter. This evidence was admitted over objection and, at the close of the State's case, defendant's counsel moved for an adjournment so that they might take depositions of witnesses in Colorado. The court refused the application for want of a sufficient showing.

The petitioner's contentions, based upon the Fourteenth Amendment, are: that the conduct of the prosecuting

officials and police officers denied him the equal protection of the laws; that his conviction deprived him of his life without due process, because the testimony of Hope, an accomplice, was not corroborated as required by the Penal Code of California, and was, therefore, insufficient to sustain a conviction; because Hope's affidavits filed since the trial showed that his testimony was obtained by deceit, fraud, collusion, and coercion, and was known to the prosecutor to be false, and hence the trial was a mere pretense; because the alleged occurrences in Colorado were wholly disconnected from the crime charged, and petitioner was afforded no opportunity to answer the State's evidence respecting them; because the production of the rattlesnakes in the court was solely for the purpose of inflaming the jury; and because physical violence, threats, and other coercive means produced the confessions, and denial of requested opportunity to consult counsel preceded and accompanied their procurement.

*First.* The contention that illegal conduct on the part of the State's officers deprived petitioner of the equal protection of the laws hardly needs notice. The claim is that where officers violate the law so that some defendants are treated as was petitioner, and others are treated as the law requires, inequality and discrimination results which denies equal protection. The contention is frivolous. The record is bare of any proof to support it.

*Second.* The petitioner asserts that Hope's testimony was not corroborated. Under California law, the uncorroborated testimony of an accomplice is not sufficient to sustain a conviction.[7] Petitioner contends that, in consideration of Hope's confessing and turning state's evidence, leniency was extended him by the court. Petitioner says that Hope's affidavits show that the prosecuting officials well knew that Hope's testimony was a

---

[7] Penal Code § 1111.

fabrication; that he was persuaded so to testify by fraud, promises of leniency, and threats, and the trial was a mere sham.[8]

These contentions need but brief notice. The Fourteenth Amendment does not forbid a state court to construe and apply its laws with respect to the evidence of an accomplice. There is no adequate showing that there was a corrupt bargain with Hope, and the practice of taking into consideration, in sentencing an accomplice, his aid to the State in turning state's evidence can be no denial of due process to a convicted confederate. Hope's affidavits not only were prepared after the State Supreme Court had passed upon the case and its opinion had been published but after the lapse of nearly three years from the trial. They could, therefore, be considered only in the *habeas corpus* case. The State contends that it had no opportunity to answer them. This is contested by the petitioner. In any event, it was stipulated that the record on appeal in the other case should be part of the record on the *habeas corpus* hearing; and comparison of the testimony at the trial with the allegations of the affidavits raises serious doubts as to their truthfulness. The appraisal of the conflicting evidence was for the court below. Even if its refusal to believe Hope's depositions were erroneous, the error would be no more a denial of due process than was its approval, on appeal, of the trial judge's refusal to direct a verdict on the ground of insufficiency of evidence.

*Third.* Testimony was admitted concerning the death of James' former wife, on the widely recognized principle that similar but disconnected acts may be shown to establish intent, design, and system.[9] The Fourteenth Amendment leaves California free to adopt a rule of relevance

---

[8] Cf. *Mooney* v. *Holohan,* 294 U. S. 103.

[9] See Wigmore, Evidence (3rd Ed.) Vol. II, § 363.

which the court below holds was applied here in accordance with the State's law.

The insistence that the trial judge's refusal to grant a continuance, so that petitioner could take answering depositions, was a denial of due process goes even farther afield. Counsel had notice at the opening of the trial, or shortly thereafter, that the State intended to introduce evidence on this subject,—but waited until the State had rested before asking the continuance. Even then the showing was inadequate as to the identity of the witnesses and the nature of the expected evidence. The judge, in the exercise of his discretion, denied the motion. The Fourteenth Amendment gives this Court no mandate to review his action or inquire whether he abused his discretion in such a field.

*Fourth.* A part of the State's case was that Hope had purchased snakes and brought them to the petitioner in pursuance of the conspiracy. Two snakes were brought into the courtroom to be identified by the witness who said he sold them to Hope. The petitioner says that the sole purpose of the production of the snakes was to prejudice the jury against him and that those in the courtroom, including the jury, were in a panic as a result of the incident. For this he cites current newspaper accounts and affidavits of his counsel. The State denies any improper purpose and, to rebut the assertions of petitioner, relies on a counter-affidavit and a statement by the trial judge. The record discloses that at a subsequent stage of the trial the snakes were brought into court at the defendant's request.

We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by

a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process.

*Fifth.* The important question is whether the use of the confessions rendered petitioner's conviction a deprivation of his life without due process of law. Recital of the relevant facts is essential to a decision.

The petitioner, while having almost no formal education, is a man of intelligence and business experience. After his arrest, on the charge of incest, on the morning of Sunday, April 19, 1936, he was taken for a short time to the adjoining house and shown a dictaphone there installed. He was brought to the District Attorney's offices, where he was lodged in the Bureau of Investigation. He says that during the two or three hours he stayed there he was not questioned. He was taken into an office where the District Attorney showed him a statement made by a Miss Wright respecting the incest charge and asked him what he cared to say about it. He replied that he would not talk about it. He was questioned for about an hour. He says he was asked about his wife's death; others who were present deny this.

He was held in the District Attorney's suite until 5 or 6 o'clock, was given supper at a cafe, and then conducted to the house next door to his home, where he arrived about 7 or 7:30. Various officers questioned him there, in relays throughout the night, concerning his wife's death. He sat in a chair fully dressed and had no sleep. Monday morning he was taken out for breakfast and went with the officers to point out to them a house at 9th and Alvarado Streets, after which he was taken to the District Attorney's offices. He was brought back to the house next door to his home, and the questioning was resumed, and continued until about 3 o'clock Tuesday morning, when, he says, he fainted; and others present say he fell asleep and slept until 7 or 8 o'clock. After he had breakfasted he was

booked at the jail, arraigned before a magistrate, and committed on the incest charge.

James testified that about 10 P. M. Monday, April 20, the officers began to beat him; that his body was made black and blue; that the beating impaired his hearing, and caused a hernia; that later that night an Assistant District Attorney questioned him and that, after this ordeal, he collapsed. It is admitted that an officer slapped his face that night. This is said to have occurred as the result of an offensive remark James made concerning his wife; he denies having made the remark. In corroboration of James' testimony two witnesses said they noticed that one or both of his ears were bruised and swollen when he was lodged in the jail. All of this testimony is contradicted by numerous witnesses for the State, save only that it is admitted James was repeatedly and persistently questioned at intervals during the period from Sunday night until Tuesday morning. It is testified that, except for the one slap, no one laid a hand on James; that no inducement was held out to him; that no threats were made; that he answered questions freely and intelligently; and that he was at ease, cool, and collected. He admits that no promises or threats were made or maltreatment administered on the occasions when he was in the District Attorney's office. It is significant that James stated to one of the other officers that Officer Southard had slapped him and that when, May 2, the District Attorney asked how he had been treated, he again referred to the slap. In neither case did he say anything of any other mistreatment. During the period April 19–21 James made no incriminating admission or confession.

James says that shortly after his arrest on Sunday morning, he asked, and was refused, permission to get into touch with Mr. Silverman, who had been his attorney for a number of years. This is denied. There is evidence that he saw Mr. Silverman on Monday, April 20, at the District

Attorney's office.   Mr. Silverman testified that he saw the petitioner immediately after his formal arrest; that he was with the petitioner at the arraignment on Tuesday, April 21st; and again on April 25th in the jail.   It is not suggested that James was not allowed to see his attorney as often as he desired or that any obstacle was interposed to the attorney's interviewing him between April 21 and May 2.

There is no claim that from April 21, when he was lodged in the jail, until May 2, he was interviewed, questioned, threatened, or mistreated by anyone.   During this period his attorney told him that he would be indicted for his wife's murder and should not answer any questions unless his attorney was present.

May 1, Hope was arrested and made a statement.   On the morning of May 2, James was brought from his cell to the chaplain's room in the prison and confronted with Hope.   An Assistant District Attorney outlined Hope's story and asked James whether he had anything to say, to which he replied: "Nothing."

He went back to his cell and, about noon, an order of court was obtained to remove him from the prison.   He was taken to his former home by two deputy sheriffs. The evidence does not disclose clearly either the purpose or the incidents of this trip.   He was then brought to the District Attorney's office and that official began to question him.   He requested that his attorney be sent for. In his presence a telephone call was made which disclosed that Mr. Silverman was not in Los Angeles.   He asked that another attorney be summoned.   He states that the District Attorney said it would take too long to acquaint any other attorney with the facts; others say that James did not give the name of the other attorney he wanted and it took some time to discover whom he had in mind. The attorney was not summoned.

The District Attorney and, at times, others questioned James until supper time.   Sandwiches and coffee were

procured. James says he had coffee but someone took his sandwiches. There is testimony that he had them. The questioning, based on Hope's confession, was continued into the night without James having refused to answer questions or having made any incriminating answers.

There is a sharp conflict as to how the session terminated. James says that Officer Southard, who had struck him on April 20, occupied the room alone with him, all others having left; that the officer told him he had been lying all evening and that if he did not tell the truth the officer would take him back to the house and beat him; that this so frightened him that he agreed to do his best to recite to the District Attorney the same story Hope had told. There is much evidence that no such incident occurred. Deputy Sheriff Killion says that sometime before midnight the others had left petitioner alone with him, and that petitioner turned to him and said something to the effect: "Why can't we go out and get something to eat; if we do I'll tell you the story." To this Killion replied that they could go out. Killion and another Deputy Sheriff, Gray, a lady friend, and another person accompanied petitioner to a public cafe, where they had a supper and afterwards had cigars. James testified that neither Killion nor Gray nor the District Attorney ever laid hand on him, threatened him or offered him any inducement to confess.

The State's evidence is that, after they started to smoke, James told a story, of which Killion took notes. Killion narrated at the trial what James had told him. The party returned to the District Attorney's office and there, responding to a question by the District Attorney, James said he had told Killion the story, and, in answer to questions, he repeated that story. The interview was stenographically recorded. Most of the questions were asked by the District Attorney, some few by Killion and one or two

other officers who were present.   The group seems to have consisted of the District Attorney, an Assistant District Attorney, two officers, the two deputy sheriffs, and the stenographer.

Hope's statement laid on James the initiation of the murder plot, the attempt to consummate it with snake poison, the drowning and the disposition of her body. The account James gave Killion and the District Attorney, which he now says was an attempt to retell the tale Hope had told, which had been constantly dinned into his ears, is by no means a reiteration of Hope's story.   On the contrary, James insisted that Hope suggested the destruction of Mary James, and the rattlesnake expedient, which Hope carried out; that when this failed Hope suggested that he, Hope, burn down the house to make it appear that Mrs. James died by accident; and that Hope also volunteered to commit an abortion on Mrs. James and also to do away with her.   James asserted that, while he was absent from his home on the morning of August 5, 1935, Hope drowned his wife in the bathtub and told James that he had done so.

It is also to be noted that James' statement presents a lurid picture of the heavy drinking and intoxication of Hope, James, and Mary James during the three days anterior to the death of the latter.   The effort evidently was to suggest that all were more or less irresponsible for their actions.

If Hope's story is true, James planned and accomplished the murder of his wife to obtain the insurance on her life. If James' statement is true, Hope planned the murder, James desired to abandon the scheme and thought that all Hope ultimately intended to do was to commit an abortion on James' wife, and was shocked and surprised to learn that Hope had murdered her.

James said during supper at the cafe, and stated on another occasion, that there were not enough men in the

District Attorney's office to make him talk, and if Hope had not talked he would never have told the story.

Scrutiny of the two statements indicates that James carefully considered what Hope had said, and made up his mind to tell a story consistent with his intimacy with Hope, and with various incidents James could not deny, and then depict a drunken orgy as a result of which his will power was so enfeebled that he could not resist Hope's determination to make away with Mrs. James.

At the trial, James contradicted the essential particulars of Hope's testimony and most of his own confession, including the evidence respecting the snakes. He swore all Hope was to do was to attempt an abortion; he believed Hope did not accomplish this, and that his wife died as a result of falling into the pond in a fainting fit due to her pregnancy.

The evidence as to the treatment of James and the conduct of officials and officers, from the moment of his arrest until the close of his statement to the District Attorney, was heard preliminarily by the trial judge in order to determine whether the State had, as required by California law, carried its burden of proving the confessions voluntary. The ruling was that it had; and the confessions were admitted. The trial judge, at defendant's request, charged the jury, in accordance with the State law, that the confessions must be utterly disregarded unless they were voluntary, that is, not the result of inducements, promises, threats, violence, or any form of coercion.

The failure of the arresting officers promptly to produce the petitioner before an examining magistrate, their detention of him in their custody from Sunday morning to Tuesday morning, and any assault committed upon him, were violations of state statutes [10] and criminal offenses.[11]

---

[10] California Penal Code §§ 849, 4004.

[11] *Id.* §§ 145, 146, 149.

We find no authority for the issue of the court order under which the sheriff's deputies took the accused from jail to his former home, and to the District Attorney's office for questioning.[12] The denial of opportunity to consult counsel, requested on May 2nd, was a misdemeanor.[13] It may be assumed this treatment of the petitioner also deprived him of his liberty without due process and that the petitioner would have been afforded preventive relief if he could have gained access to a court to seek it.

But illegal acts, as such, committed in the course of obtaining a confession, whatever their effect on its admissibility under local law, do not furnish an answer to the constitutional question we must decide. The effect of the officers' conduct must be appraised by other considerations in determining whether the use of the confessions was a denial of due process. Moreover, petitioner does not, and cannot, ask redress in this proceeding for any disregard of due process prior to his trial. The gravamen of his complaint is the unfairness of the use of his confessions, and what occurred in their procurement is relevant only as it bears on that issue.

---

[12] The record does not disclose whether the application for the order was in the form of a petition; whether defendant was apprised of the motion for the order; whether he consented to its issue, or what representations were made to the court which granted the order. Section 4004 of the 1941 Code (§ 1600 of the 1935 Code) requires a prisoner committed by a magistrate to be confined in a jail until legally discharged, and declares that if he is permitted to go at large out of the jail, except by virtue of a legal order or process, this shall constitute an escape. The only statutes we are able to find authorizing an order for the removal of a prisoner from jail are §§ 4011 and 4012 of the Penal Code, 1941, (§§ 1607 and 1608 of the 1935 Code) which provide for cases of individual illness or a general outbreak of pestilence or disease in a prison. Section 4011 permits a removal without court order in case of fire.

[13] Penal Code, § 825.

On the other hand, the fact that the confessions have been conclusively adjudged by the decision below to be admissible under State law, notwithstanding the circumstances under which they were made, does not answer the question whether due process was lacking. The aim of the rule that a confession is inadmissible unless it was voluntarily made is to exclude false evidence. Tests are invoked to determine whether the inducement to speak was such that there is a fair risk the confession is false.[14] These vary in the several States.[15] This Court has formulated those which are to govern in trials in the federal courts.[16] The Fourteenth Amendment leaves California free to adopt, by statute or decision, and to enforce, such rule as she elects, whether it conform to that applied in the federal or in other state courts. But the adoption of the rule of her choice cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law. The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false. The criteria for decision of that question may differ from those appertaining to the State's rule as to the admissibility of a confession.

As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial. Such unfairness exists when a coerced confession is used as a means

---

[14] Wigmore, Evidence (3d Ed.) §§ 823, 824.

[15] *Id.* § 824.

[16] *Sparf and Hansen* v. *United States*, 156 U. S. 51, 55; *Wilson* v. *United States*, 162 U. S. 613, 622; *Bram* v. *United States*, 168 U. S. 532; *Wan* v. *United States*, 266 U. S. 1, 14.

of obtaining a verdict of guilt. We have so held in every instance in which we have set aside for want of due process a conviction based on a confession.

To extort testimony from a defendant by physical torture in the very presence of the trial tribunal is not due process. The case stands no better if torture induces an extra-judicial confession which is used as evidence in the courtroom.[17]

A trial dominated by mob violence in the courtroom is not such as due process demands.[18] The case can stand no better if mob violence anterior to the trial is the inducing cause of the defendant's alleged confession.

If, by fraud, collusion, trickery, and subornation of perjury, on the part of those representing the State, the trial of an accused person results in his conviction, he has been denied due process of law.[19] The case can stand no better if, by the same devices, a confession is procured, and used in the trial.

The concept of due process would void a trial in which, by threats or promises in the presence of court and jury, a defendant was induced to testify against himself. The case can stand no better if, by resort to the same means, the defendant is induced to confess and his confession is given in evidence. As we have said, "due process of law . . . commands that no such practice . . . shall send any accused to his death."[20]

Where the claim is that the prisoner's statement has been procured by such means, we are bound to make an independent examination of the record to determine the validity of the claim. The performance of this duty cannot be foreclosed by the finding of a court, or the verdict

---

[17] *Brown* v. *Mississippi*, 297 U. S. 278.

[18] *Moore* v. *Dempsey*, 261 U. S. 86.

[19] *Mooney* v. *Holohan*, 294 U. S. 103.

[20] *Chambers* v. *Florida*, 309 U. S. 227, 241.

of a jury, or both.[21] If the evidence bearing upon the question is uncontradicted, the application of the constitutional provision is unembarrassed by a finding or a verdict in a state court; even though, in ruling that the confession was admissible, the very tests were applied in the state court to which we resort to answer the constitutional question.[22]

There are cases, such as this one, where the evidence as to the methods employed to obtain a confession is conflicting, and in which, although denial of due process was not an issue in the trial, an issue has been resolved by court and jury, which involves an answer to the due process question. In such a case, we accept the determination of the triers of fact, unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process.

Here, judge and jury passed on the question whether the petitioner's confessions were freely and voluntarily made, and the tests applied in answering that question rendered the decision one that also answered the question whether the use of the confessions involved a denial of due process; this notwithstanding the issue submitted was not *eo nomine* one concerning due process. Furthermore, in passing on the petitioner's claim, the Supreme Court of the State found no violation of the Fourteenth Amendment. Our duty, then, is to determine whether the evidence requires that we set aside the finding of two courts and a jury, and adjudge the admission of the confessions so fundamentally unfair, so contrary to the common concept of ordered liberty, as to amount to a taking of life without due process of law.

---

[21] *Brown* v. *Mississippi, supra,* 278; *Chambers* v. *Florida, supra; Canty* v. *Alabama,* 309 U. S. 629; *White* v. *Texas,* 310 U. S. 530; *Vernon* v. *Alabama,* 313 U. S. 547; *Lomax* v. *Texas,* 313 U. S. 544.

[22] Cases *supra,* Note 21.

In view of the conflicting testimony, we are unable to say that the finding below was erroneous so far as concerns the petitioner's claims of physical violence, threats, or implied promises of leniency. There remains the uncontradicted fact that on two occasions, separated by an interval of eleven days, the petitioner was questioned for protracted periods. He made no admission implicating him in his wife's death during, or soon after, the interrogations of April 19, 20, and 21. If, without more, eleven days later, confessions had been forthcoming, we should have no hesitation in overruling his contention respecting the admission of his confessions.

Does the questioning on May 2nd, in and of itself, or in the light of his earlier experience, render the use of the confessions a violation of due process? If we are so to hold, it must be upon the ground that such a practice, irrespective of the result upon the petitioner, so tainted his statements that, without considering other facts disclosed by the evidence, and without giving weight to accredited findings below that his statements were free and voluntary, as a matter of law, they were inadmissible in his trial. This would be to impose upon the state courts a stricter rule than we have enforced in federal trials.[23] There is less reason for such a holding when we reflect that we are dealing with the system of criminal administration of California, a quasi-sovereign; that if federal power is invoked to set aside what California regards as a fair trial, it must be plain that a federal right has been invaded.

We have not hesitated to set aside convictions based in whole, or in substantial part, upon confessions extorted in graver circumstances. These were secured by protracted and repeated questioning of ignorant and untutored persons, in whose minds the power of officers

---

[23] *Wan* v. *United States*, 266 U. S. 1, 14, and cases cited.

was greatly magnified; who sensed the adverse sentiment of the community and the danger of mob violence; who had been held incommunicado, without the advice of friends or of counsel; some of whom had been taken by officers at night from the prison into dark and lonely places for questioning.[24] This case is outside the scope of those decisions.

Like the Supreme Court of California, we disapprove the violations of law involved in the treatment of the petitioner, and we think it right to add that where a prisoner, held incommunicado, is subjected to questioning by officers for long periods, and deprived of the advice of counsel, we shall scrutinize the record with care to determine whether, by the use of his confession, he is deprived of liberty or life through tyrannical or oppressive means. Officers of the law must realize that if they indulge in such practices they may, in the end, defeat rather than further the ends of justice. Their lawless practices here took them close to the line. But on the facts as we have endeavored fairly to set them forth, and in the light of the findings in the state courts, we cannot hold that the illegal conduct in which the law enforcement officers of California indulged, by the prolonged questioning of the prisoner before arraignment, and in the absence of counsel, or their questioning on May 2, coerced the confessions, the introduction of which is the infringement of due process of which the petitioner complains. The petitioner has said that the interrogation would never have drawn an admission from him had his confederate not made a statement; he admits that no threats, promises, or acts of physical violence were offered him during this questioning or for eleven days preceding it. Counsel had been afforded full opportunity to see him and had advised him.

[24] See *Chambers* v. *Florida*; *Canty* v. *Alabama*; *White* v. *Texas*; *Vernon* v. *Alabama*; *Lomax* v. *Texas, supra,* Note 21.

He exhibited a self-possession, a coolness, and an acumen throughout his questioning, and at his trial, which negatives the view that he had so lost his freedom of action that the statements made were not his but were the result of the deprivation of his free choice to admit, to deny, or to refuse to answer.

The judgments are

*Affirmed.*

MR. JUSTICE BLACK, dissenting, with whom MR. JUSTICE DOUGLAS concurs:

I believe the confession used to convict James was the result of coercion and compulsion, and that the judgment should be reversed for that reason. The testimony of the officers to whom the confession was given is enough, standing alone, to convince me that it could not have been free and voluntary. Cf. *Bram* v. *United States,* 168 U. S. 532. In brief, those officers admitted the following:

Suspecting the defendant of murder, they entered his home on Sunday, April 19, 1936, at 9 a. m. He was taken to a furnished house next door, in which the State's Attorney's office had installed a dictaphone. For the next forty-eight hours, or a little longer, the State's Attorney, his assistants, and investigators held James as their prisoner. He was so held, not under indictment or warrant of arrest, but by force. At about 4 a. m. Monday, one Southard, an investigator, "slapped" the defendant, whose left ear was thereafter red and swollen. James was apparently kept at the State's Attorney's office during the daylight hours; the full extent to which he was questioned there is not clear. But on Monday and Tuesday nights, at the furnished house, with no one present but James and the officers, he was subjected to constant interrogation. The questioning officers divided themselves into squads, so that some could sleep while the others continued the question-

ing. The defendant got no sleep during the first forty-two hours after the officers seized him. And about 3:30 or 4 a. m. Tuesday morning, while sitting in the chair he occupied while being interrogated, at the very moment a question was being asked him, the defendant fell asleep. There he remained asleep until about 7 or 8 a. m. At about 11 a. m. the officers took him to jail and booked him on a charge of incest. During the entire forty-two hours defendant was held, he repeatedly denied any complicity in or knowledge of the murder of his wife.

The second episode during which the officers held defendant incommunicado, and which produced the confession, was on May 2 and in the early hours of May 3. About 11 a. m. on May 2, an investigator for the District Attorney took James from his cell to the chaplain's room of the jail. In the presence of an Assistant District Attorney he was confronted by Hope and told that Hope had made a confession implicating James in his wife's murder. James refused to talk and was then carried back to his cell. A short time later, under a purported order of court, the nature or authority of which does not appear, James was taken from the jail to his home, and then, somewhere between 1 and 4 p. m., to the District Attorney's office. The doors were locked. From then until about midnight the District Attorney, his Assistants, and investigators, subjected James to constant interrogation. Upon asking for his attorney, James was told he was out of the city. He then asked for another, but whatever efforts the officers made to satisfy this request were unsuccessful. He was again confronted with Hope, but neither this nor the questioning had elicited an admission of any nature, by midnight. At that time, according to the investigators, James said to one of them, "Can't we go out and get something to eat—if you fellows will take me out to eat now, I will

tell you the story." [1]  He was taken out to eat by some of the officers; remained about an hour and a half; while at the restaurant made damaging admissions, and upon his return to the District Attorney's office made the full statement which was used to bring about his conviction, completing it at about 3 a. m.  Southard, the investigator who had previously "slapped" him, was one of the signed witnesses of the confession.[2]

I think the facts set out are sufficient to make applicable the principles announced in *Chambers* v. *Florida*, 309 U. S. 227, and the conclusion there announced that: "Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death." *White* v. *Texas*, 310 U. S. 530, 533; *Canty* v. *Alabama*, 309 U. S. 629; *Vernon* v. *Alabama*, 313 U. S. 547.  Cf. *Bram* v. *United States, supra.*

---

[1] This is rather close to a part of James' own testimony, to wit: "He continued to question me until later on in the evening.  I was very sick.  I was hungry; I was tired, and I told him a thousand times that I didn't know anything about Hope's story."

[2] James' testimony at this point was that Southard, left alone with him shortly before midnight, said James had been lying to the District Attorney long enough and threatened to take him back once again to the house next door to his home where James had been questioned April 19 to 21.  In response to an inquiry whether he was told his confession might be used against him, James replied: "I didn't know whether the statement would be used against me, or not.  I would rather die than to have gone back to that house and went through torture like the three days I was out there.  I didn't care whether the statement was taken, or not."