**UNITED STATES of America**

v.

**Richard HAMILTON, Everald B. Gallimore–Daly, a/k/a "Michael Palmer," and Ivan Rutiba, Defendants.**

No. 89 Cr. 812 (RPP).

United States District Court,
S.D. New York.

Feb. 20, 1990.

Otto Obermaier, U.S. Atty., S.D.N.Y., New York City, Robert Ray, for the U.S.

Paul Davison, The Legal Aid Soc., Robert A. Sackett, Sanford M. Katz, Katz & Weinstein, New York City, for defendants.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr.,
District Judge.

This case arises out of a serious disturbance that occurred on October 4, 1989 at an Immigration and Naturalization Service ("INS") facility. As more fully described below, the disturbance began as an assault on an INS officer and escalated into a near-riot, causing loss of control of the facility for nearly four hours. Defendants Richard Hamilton, Ivan Rutiba and Everald Gallimore–Daly, a/k/a "Michael Palmer" are alleged to have been among the participants in the events of that day.

Defendant Rutiba moves this Court for an order dismissing the indictment against him on the grounds that the government violated his rights to due process under the Fifth Amendment and compulsory process under the Sixth Amendment. He contends that his ability to establish his defense, namely that he was misidentified as one of the participants in the disturbance, has been significantly damaged by actions of the government. Specifically, it is argued that the government violated Mr. Rutiba's rights by (1) deporting a witness whose testimony would have been material and favorable to his defense, and (2) deporting several eyewitnesses to the alleged assault without ascertaining whether their testimony would be helpful to the defense and without granting the defendant access to these eyewitnesses prior to deporting them.

The prosecution and the defense are in general agreement as to the events of October 4, 1989.[1] On that day, there were approximately 90 detainees housed in Dormitories 15 and 16 of the INS Special Processing Center at 201 Varick Street in Manhattan ("SPC"). The 90 detainees were all English-speaking and predominantly black. They had access to both dormitories and the recreation and dining facilities which served them. A significant number of the detainees were in the facility's dining room serving Dorms 15 and 16 at approximately 9:15 a.m. At that time, one detainee, alleged to be defendant Hamilton, refused to submit to a routine search as he left the dining room after breakfast, and allegedly threatened the INS Officer attempting to conduct the search, Officer Mark Saccamano. The situation quickly deteriorated. A number of detainees surrounded Officer Saccamano and assaulted him. Additional INS Officers were called to assist him but were confronted by several detainees and were forced to withdraw. For the next four hours, until approximately 1:00 p.m., the facility was out of the control of the officers. During that period, unidentified detainees are said to have vandalized the recreation and dormitory areas of the facility by, among other things, starting a fire and breaking windows, all of which caused substantial damage.

When order was reestablished in the facility, defendant Rutiba, a black English-speaking man, was identified as having participated in the attack on Officer Saccamano and in the harassment of other immigration officers during the disturbance. After he, Hamilton and Gallimore–Daly were arrested, Mr. Rutiba was immediately removed from the general detainee population and has since been housed at the Manhattan Correctional Center.

On October 24, 1989, the Grand Jury, in a one-count indictment, charged the three defendants with forcibly resisting, opposing, impeding, intimidating and interfering with immigration officers on October 4, 1989, in violation of 18 U.S.C. §§ 111, 2.

## I. BACKGROUND

The government and the defense have submitted affidavits describing the events leading up to the present motion. The relevant facts are undisputed.

On October 18, 1989, Mr. Rutiba's defense counsel, Paul Davison of the Federal Defender Services Unit of the Legal Aid Society, began his effort to prevent the deportation of witnesses who could poten-

---

1. A conference was held on February 8, 1990, at which counsel for Mr. Rutiba and the United States advised the Court in some detail of the operative facts. Nothing in this opinion is meant to prejudice the right of the defendants not party to this motion to contradict these facts at later stages of this case.

tially exculpate Mr. Rutiba. On that day, Mr. Davison sent a letter to the Assistant United States Attorney ("AUSA") assigned to the case requesting that the government temporarily suspend the deportation of the approximately 90 or so detainees who were in Dorms 15 and 16 at the time of the disturbance. The AUSA replied by letter dated October 20, 1989, requesting that Mr. Davison specify the names of the detainees he did not want deported and stating that Mr. Davison should contact him if he needed help.[2]

Because Mr. Rutiba had been removed from the SPC immediately after the disturbance, and because Mr. Rutiba knew many of his fellow detainees only by their nicknames, if at all, Davison was unable to provide a complete list of possible alibi witnesses. Nonetheless, on October 26, 1989, Mr. Davison sent a letter to the AUSA giving the names of five potential witnesses: "Kwadwo," Eupert Morgan, Kenneth Williams, "Belhomme," and "Uncle."

In the meantime, the defense had also begun an effort to interview detainee witnesses. On October 23, 1989, Meredith Randall, a law student working with Mr. Davison, visited the SPC in an effort to arrange such interviews. Ms. Randall was informed that such interviews would have to be arranged through INS executives at 26 Federal Plaza, but the people with whom she spoke were unable to specify whom she should contact or to which office she should go in order to make such arrangements.

Because the defense had encountered these difficulties in identifying and gaining access to the detainees, Mr. Davison also requested in his October 26 letter to the

AUSA that the government assist him in obtaining a roster of the detainees present in Dorms 15 and 16 on October 4, 1989. Mr. Davison further requested that the government assist in developing a procedure whereby defense counsel could enter the SPC or other INS detention facilities to interview detainees to determine if their presence at trial would be necessary. The AUSA subsequently attempted to obtain the list Mr. Davison requested, but was advised by the INS that no such list was available.

A pre-trial conference was held before the Court on November 2, 1989. During the conference, the AUSA made assurances to the Court that the government would attempt to facilitate defense interviews. Transcript, Nov. 2, 1989, at 4. Defense counsel and the government agreed to proceed informally in identifying material witnesses, and the Court instructed all counsel to proceed quickly.[3]

During November 1989, Mr. Rutiba compiled, as a result of correspondence it appears, a list containing the names of 23 detainees who were in Dorms 15 and 16 on the day of the disturbance. After several communications between the government and defense counsel concerning access to the detainees at the SPC, the government advised on Friday, December 1, 1989 that interviews could be arranged through INS official Carl Gaglia. Defense counsel made such arrangements without delay.

On Monday, December 4, 1989, Ms. Randall went to the SPC to interview ten detainees Mr. Rutiba had designated as especially important. Ms. Randall was able to interview only six of them, as the others

---

**2.** The government did not make a systematic attempt to interview all of the approximately 90 detainees who were present on October 4, although it has interviewed some of them.

**3.** The relevant discussion went as follows:

MR. DAVISON: There is also the issue of possible deportation of some of these witnesses and the law seems to suggest that in order to object to that, you have to establish what the witness' testimony would be so we do need to get access to these witnesses.

THE COURT: Does it require anything from the court?

MR. DAVISON: What I would propose is that we work informally with [the AUSA] to—

THE COURT: If you need anything from the court, make an application. It seems to me you ought to have prompt interviews because the witnesses may be gone, for one thing, by the time, if you don't, and secondly, people won't remember, both officers and inmates.

Transcript, Nov. 2, 1989, at 5.

were no longer located there. One of those she interviewed was Winston DeVerteuil.

In an affidavit submitted in connection with the present motion, Ms. Randall states that Winston DeVerteuil told her that he and Mr. Rutiba had been in Dorm 16 throughout the disturbance on October 4, 1989, in contradiction to the allegations of the complaint that Mr. Rutiba participated in the attack on Officer Saccamano in Dorm 15, and that Mr. Rutiba had not participated in any of the attacks on or interference with INS officers that occurred during the course of the disturbance. Ms. Randall's affidavit further states that Mr. DeVerteuil was intelligent and well-spoken and spoke English with no discernible accent; in short, that Mr. DeVerteuil would make an excellent witness. The defense asserts that Mr. DeVerteuil's testimony is not cumulative of the testimony of other witnesses they have been able to locate.

The following morning, December 5, 1989, a pre-trial conference was held before the Court. After other matters were discussed, Mr. Rutiba voiced his concern that material witnesses not be deported. After some discussion, the AUSA stated:

> I will contact the INS and the standing order of the court is that nobody should be moved that can potentially be a witness as of today's date.

Transcript, Dec. 5, 1989, at 7. The Court directed the defendants to supply it and the government with the names of the specific witnesses they did not want deported so that it could issue an order suspending their deportation.[4]

4. The relevant discussion went as follows:

> MR. WEINSTEIN [appearing in place of Mr. Davison]: These were matters that I know Mr. Davison had discussed with the government and there was an exchange of letters and the government had undertaken to maintain the witnesses' status.
> THE COURT: But I think you have to notify the government as to the identity of the witnesses that you intend to call for them to be able to prevent their deportation.
> MR. WEINSTEIN: We have identified witnesses for interviewing and, as that process moves along, we will be identifying witnesses for trial.

After the conference, the AUSA telephoned Mr. Gaglia and informed him that the Court would be signing an order suspending the deportation of certain detainees. The AUSA was told that compliance with the Court's Order would have to be worked out with the office of the INS District Director.

That afternoon, the defense provided the Court and the AUSA with a proposed order listing the 23 detainees Mr. Rutiba had previously identified as potential defense witnesses, including Winston DeVerteuil. The Court signed the order on December 5, 1989, and notified counsel. The order was filed in the clerk's office on December 6, 1989. A certified copy of the order was served on the INS on December 6, 1989 at 11:13 a.m.

Winston DeVerteuil was deported at approximately 9:15 a.m. on December 6, 1989. A second man identified in the December 5, 1989 order as "T. Jarvis" was deported on December 10, 1989. It was later learned that two of the five people named in Mr. Davison's October 26, 1989 letter, Eupert Morgan and Kenneth Williams, had been deported in November 1989.

## II. DISCUSSION

The due process clause of the Fifth Amendment guarantees that a criminal defendant will be treated "with that fundamental fairness essential to the very concept of justice." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982) (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941)). The Sixth Amendment guarantees a criminal

> [The AUSA]: Your Honor, I will undertake on behalf of the government, as soon as I am informed of the order, to put a hold on whoever it is.
> THE COURT: Put a hold on in the interim because things can unwittingly cause a problem with the prosecution.
> [The AUSA]: I will contact INS and the standing order of the court is that nobody should be moved that can potentially be a witness as of today's date.
> THE COURT: It is incumbent upon the defense to name who the persons are that they feel have evidence here.
> Transcript, Dec. 5, 1989, at 8–9.

defendant "compulsory process for obtaining witnesses in his favor," U.S. Const., Amndt. 6, a right that "is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

■ The compulsory process and due process rights are both implicated where actions of the government prevent a defendant from obtaining material and favorable evidence. *See, e.g., United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Thus, when a material and favorable witness is under the government's control, the government has a certain degree of obligation to ensure that the witness is not rendered unavailable to the defendant.

In *Valenzuela–Bernal*, the Supreme Court established a test for determining whether the deportation of potential defense witnesses violates a defendant's Fifth Amendment right to due process and Sixth Amendment right to compulsory process. The Court held that to establish a violation of these rights, a defendant must make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873, 102 S.Ct. at 3449. *See also United States v. Ginsberg*, 758 F.2d 823, 831 (2d Cir. 1985).

In *Valenzuela–Bernal*, the defendant, an illegal alien, was arrested while driving a car with other illegal aliens as passengers. An Assistant United States Attorney concluded the three passengers possessed no material evidence and deported two of them before the defense had an opportunity to interview them. The defendant claimed his Fifth and Sixth Amendment rights had been violated. The Court upheld the conviction on the grounds that the defendant had made "no effort to explain what material, favorable evidence the deported passengers would have provided for his defense." *Id.* at 874, 102 S.Ct. at 3450.

■ In this case the defendant has made a plausible showing that the testimony of DeVerteuil would have been material, favorable to his defense, and non-cumulative. In fact, Ms. Randall's affidavit indicates that DeVerteuil would have testified that Mr. Rutiba did not participate in the crime alleged in the indictment. In light of these facts, the government's action in deporting Winston DeVerteuil appears to have significantly damaged his right to receive a fair trial. Thus, the defense has made the showing required of it under *Valenzuela–Bernal.*

The government does not dispute that Mr. DeVerteuil's testimony would have been material and favorable to Mr. Rutiba's defense. The government argues that, in applying the *Valenzuela–Bernal* rule, the Court must consider the diligence with which the defendant attempted to identify the deported witness as a material and favorable one. The government's position in this case is that any prejudice that resulted from DeVerteuil's deportation is defendant's fault, because his counsel was dilatory in identifying Mr. DeVerteuil as a potential witness and interviewing him, and then did not notify the INS that it should not deport Mr. DeVerteuil until after the deportation had been accomplished. In support of this position, the government stresses that, until it received the December 5, 1989 Order, it did not know which detainees the defense would claim were material witnesses.

The government's argument is unpersuasive for two reasons. First, defense counsel for Mr. Rutiba proceeded with reasonable diligence in their efforts to identify potential witnesses, interview them and determine if they would be necessary at trial. Second, the government's deportation of Mr. DeVerteuil on December 6 violated the December 5 Order of the Court suspending his deportation, and the AUSA had specifically undertaken on December 5 to preserve the status quo while the order was prepared.

### 1. *The Defense's Diligence*

The government argues that the defense should have notified it earlier that Mr. DeVerteuil was a material witness that

should not be deported. The Court finds, however, that Mr. Davison proceeded diligently in attempting to identify the approximately 90 detainees who were present in Dorms 15 and 16 on the day of the disturbance, and, once some of those potential witnesses were identified, proceeded diligently to arrange interviews and notify the government of those witnesses the defense considered material.

The initial problem facing the defense was one of identifying the 90 or so people who were present at the time of his alleged crime. The defense's initial efforts in this regard were thwarted by lack of cooperation from the INS. The defense was forced to request the AUSA's assistance in obtaining a list of the detainees present in Dorms 15 and 16 on the day of the disturbance. The AUSA, however, was unable to obtain such a list from the INS.

Not until Mr. Rutiba himself was able to develop a list of 23 such detainees through correspondence in November 1989 was any progress made toward identifying and interviewing potential witnesses. Once the defense had these names, its next hurdle was arranging interviews. The defense did not receive from the AUSA the name of the person to contact at INS, Mr. Gaglia, until Friday, December 1, 1989. Arrangements were made immediately, and on the following Monday, December 4, 1989, Ms. Randall was finally able to conduct interviews, including that of Winston DeVerteuil. In light of these circumstances, the Court finds that the defense proceeded with reasonable diligence in attempting to identify material witnesses.

The government argues that once the Federal Defender became aware of the importance of Mr. DeVerteuil to Mr. Rutiba's defense, it was required to notify the government that Mr. DeVerteuil was a material witness that should not be deported. However, at the December 5, 1989 conference, the AUSA undertook to prevent the deportation of potential witnesses while an order naming specific individuals the defense did not want deported was prepared. The defense acted reasonably in relying on that representation.

Accordingly, the Court finds that the defense was diligent in its attempts to identify, interview and prevent the deportation of material witnesses.

### 2. *The Court Order*

Mr. DeVerteuil's deportation on December 6, 1989 also violated the Court's order of December 5, 1989. The United States Attorney's office received a copy of the proposed order on December 5, and the AUSA was notified by the Court later that day that the order had been signed.

The fact that the Order was not served on the INS until the next morning is of no consequence. The United States Attorney was on notice that Mr. DeVerteuil was included in the order, and had specifically undertaken the day before to prevent the deportation of potential witnesses. The Court recognizes that the INS and the United States Attorney's office are somewhat independent entities within the Justice Department, and that notice to one may not always constitute notice to the other. However, in this situation, where the United States Attorney's office had the power to secure the assistance of the INS and in fact undertook to do so, its knowledge of the Court's order not to deport Mr. DeVerteuil may be imputed to the INS.

The government also contends that the defendant was in the best position to know who the witnesses were and therefore should have informed the government of their names earlier. The government cites to language in *Valenzuela–Bernal* noting that the defendant in that case "was present throughout the commission" of the alleged defense and thus "[n]o one knows better than he" what the deported witnesses' testimony would have been. However, the circumstances of this case are such that Mr. Rutiba knew most of the numerous potential witnesses only by nickname or by sight, making specific identification difficult. The government knew that the defense was making substantial efforts to establish the identity of material witnesses, and its assistance had been requested. Accordingly, the defense cannot be faulted

**1278**

for not making the names of all potential witnesses available earlier.

### III. CONCLUSION

Nothing in this opinion is meant to imply that the United States Attorney's Office engaged in misconduct. An unfortunate chain of events, together with the conflicting missions of two agencies of the government, is apparently to blame. In retrospect, it is unfortunate that no agency of the government did conducted interviews of all ninety detainees to verify the identification of the three arrestees. The government alternatively could have informed defense counsel whenever one of the former occupants of Dorms 15 or 16 was to be deported so that an interview could be arranged and a determination made as to whether the deportation should be allowed to go ahead. In any event, the unavoidable conclusion is that the procedures followed by the government resulting in the deportation of Mr. DeVerteuil has unfairly deprived Mr. Rutiba of a material witness whose testimony at trial would quite likely have been favorable to his defense. Consequently, Mr. Rutiba's Fifth Amendment right to due process and his Sixth Amendment right to compulsory process have been violated.

Accordingly, the indictment against defendant Ivan Rutiba is hereby dismissed.[5]

SO ORDERED.

---

**5.** Because the Mr. Rutiba's indictment must be dismissed as a result of Mr. DeVerteuil's deportation, the Court need not reach his second argument, that his rights were violated by the deportation of other potential witnesses.