NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0213n.06

No. 19-2109

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

WALTER BASS, III,

    Petitioner-Appellant,

v.

SHERRY BURT, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

**FILED**
Apr 21, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

Before: NORRIS, SUTTON, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Walter Bass appeals the district court's denial of his petition for a writ of habeas corpus. He argues that the admission of certain evidence at his Michigan murder trial violated due process and that the prosecution's evidence was insufficient to support his conviction. We reject both arguments and deny his petition.

I.

We recount the facts as described by the Michigan Court of Appeals. In March 2013, Evelyn Gunter had a romantic relationship with Walter Bass, who went by the nickname Tiko. Family members last saw Evelyn driving away from her grandson's home in her Chevy Impala on the evening of March 10, 2013. Later that night, Evelyn's daughter Jemmima received a text message from Evelyn's phone, saying that Evelyn was going to Chicago and would return the next night. Jemmima sent a message back and received further responses from Evelyn's phone on March 11. The next day, Jemmima received from Evelyn's phone a message that appeared to be

addressed to someone else; the message requested drugs from someone named "Mike." A few days later, Evelyn's son Daniel repeatedly called Evelyn's phone to locate her; on either March 12 or 13, a man answered and identified himself as "Tiko." On the afternoon of March 12, two men discovered Evelyn's corpse, burned and bound with wire, in the garage of an abandoned house in Detroit. An expert determined that the perpetrator had shot Evelyn in the head before using gasoline to start the fire.

At the time, Bass worked as security at Club Celebrity in Detroit, where other employees also knew him as Tiko. He met Kateesha Bouldin there in March 2013; they exchanged numbers and began texting one another. On March 15—three days after discovery of Evelyn's body—Bass called Bouldin from Evelyn's phone. The next day, Bass called Jemmima from his own phone to ask if he could paint her house. At no point during that conversation did he mention the whereabouts of Evelyn or her car. Jemmima reported Evelyn missing on March 22, after learning that Evelyn had not reported to work since March 10.

Police promptly found Evelyn's Impala at Club Celebrity, where Bass had driven it to work that day. After learning that police had found the car, Jemmima and other family members went to Club Celebrity. There Jemmima received a call from Bass, who said that Evelyn had lent the Impala to him before she left for Chicago with a friend named Lori. When Jemmima asked him why he had said nothing about having her mother's car during their prior call, Bass "didn't really have an answer." Yet Bass had told a different story to the club's manager, saying that Evelyn had lent the car to him as a "crack rental," *i.e.* in exchange for drugs. In response, the club's manager called the police, at which point Bass left mid-shift without collecting his pay. Meanwhile, Jemmima texted Evelyn's phone and received a response saying "I'm okay, just leave

me alone." Later that night, Bass also told Evelyn's cousin that he was the "only person" with whom Evelyn had kept in contact.

Police thereafter questioned Bass, who said that Evelyn had asked him to keep her car while she traveled to Chicago with a woman named "Lori or Laura." Bass also said that he had bought drugs for them before they left, and that he had not "seen or spoken to Evelyn since" then.

The State thereafter charged Bass with first-degree murder and felony murder, among other crimes. Cell-tower records showed that Evelyn's phone never left the Detroit area during her disappearance. In addition, Evelyn's phone and Bass's phone used the same cell tower 15 times between March 14 and March 23; and the two phones did not communicate with each other at all between March 10 and March 23. Moreover, during that same period, the "home tower" for Evelyn's phone (*i.e.* the tower most often used by the phone) changed to coincide with the home tower for Bass's phone. According to an expert who testified at trial, this data strongly suggested that Bass had possessed and used Evelyn's phone after her death.

The State also introduced testimony from CB, a woman whom Bass attacked in 1996. CB lived on the same street in 1996 as Evelyn did in 2013, and though CB was not dating Bass in 1996, the two engaged in oral sex on the night in question. She testified that, sometime after the oral sex, Bass repeatedly stabbed her from behind and then dragged her down to the basement of her house. She tried to "play dead" but coughed when he poured on her a liquid that smelled like gasoline. He then raped her and wrapped her in a carpet. Shortly thereafter CB's mother returned home, at which point Bass fled. CB further testified that she identified Bass as her attacker to first responders.

The jury found Bass guilty on all charges. He appealed, arguing that the trial court had improperly admitted the evidence of his attack on CB. The Court of Appeals held that the evidence

of Bass's attempted murder of CB was properly admitted to show "proof of intent, plan, or scheme" with respect to his murder of Evelyn Gunter. The court also held that evidence of Bass's rape of CB should have been excluded at trial, but that its admission was harmless. The Michigan Supreme Court declined to hear Bass's appeal. He later filed a petition for federal habeas relief, which the district court denied. This appeal followed.

II.

We review de novo the district court's denial of Bass's habeas petition. *See Mendoza v. Berghuis*, 544 F.3d 650, 652 (6th Cir. 2008). Although the Michigan Court of Appeals rejected Bass's arguments on state-law grounds, the parties agree that the state court's decision, at least impliedly, rejected Bass's federal due-process claims on the merits. We accept that proposition for purposes of this appeal, which means that Bass must show that the state court's "adjudication of [his claims] resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). To be "unreasonable" under § 2254(d), the state court's decision must be so wrong that no reasonable jurist could agree with it. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011). Moreover, "clearly established Federal law" for purposes of § 2254(d) includes only the holdings and not the dicta of Supreme Court decisions. *See Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam). Those holdings should not be framed "at too high a level of generality," *id.* at 318; for the more general the holding, the less guidance it provides a state court as to the application of a constitutional rule to the facts of a particular case.

Bass argues that the Michigan Court of Appeals unreasonably applied two of the Supreme Court's due-process precedents—namely *Estelle v. McGuire*, 502 U.S. 62 (1991), and *Lisenba v. California*, 314 U.S. 219 (1941)—when the state court held that evidence of Bass's attempted

murder of CB was properly admitted at his trial for Gunter's murder.  But those cases are stony ground on which to seek habeas relief.  In *Estelle*, the Court held that the introduction of prior bad-acts evidence did *not* "so infuse[] the trial with unfairness as to deny due process of law."  502 U.S. at 75.  And in *Lisenba* the Court merely observed that the admission of evidence (in that case, a pair of live snakes) did not violate due process simply because it shocked "the sensibilities of those in the courtroom."  314 U.S. at 228-29.  Moreover, in both cases the Court denied relief— which means that neither case provided the state courts with a concrete example as to when the admission of evidence *does* violate due process.

Meanwhile, the due-process rule that Bass relies upon here—that the admission of evidence can be "so extremely unfair that its admission violates 'fundamental conceptions of justice[,]'" *Dowling v. U.S.*, 493 U.S. 342, 352 (1990)—is one of the most general in all of criminal law.  Never has the Supreme Court found this rule violated by the admission of prior bad-acts evidence.  Nor can Bass direct us to a single Supreme Court case in which the Court granted relief on facts remotely similar to those here.  Law clearly established by the Supreme Court's holdings thus had very little to say as to whether the admission of evidence of Bass's attempted murder of CB violated the Fourteenth Amendment's Due Process Clause.  And more than once the Supreme Court has warned us that, "where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *Woods*, 575 U.S. at 318 (cleaned up).

The state court's decision here easily fell within that broad discretion.  That court was correct that Bass's attempted murder of CB shared "a number of notable similarities" with the murder of Evelyn Gunter.  Both women lived on the same street in Detroit; both had a sexual relationship with Bass at the time of the respective attacks; both women were attacked from behind

(CB was stabbed in the back, Gunter was shot in the back of the head); both women were doused with a liquid that smelled like gasoline; and both were bound up after the attack (CB with a carpet, Gunter with wire). These similarities would allow a reasonable jurist to conclude that evidence about Bass's attempted murder of CB was relevant to the question whether Bass was Gunter's killer, and that the admission of that evidence was consistent with due process. Hence this claim fails.

The Michigan Court of Appeals separately held that a narrower slice of evidence—namely evidence that Bass raped CB near the end of his attempt to murder her—was admitted in violation of Michigan Rule of Evidence 404(b). But the court further held that the admission of this evidence was harmless in light of the "overwhelming" circumstantial proof of Bass's guilt. Yet Bass argues that admission of the rape evidence both violated due process and had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). We pass over the due-process question and address the harmlessness one. As to that question, Bass might be mistaken in his assumption that *Brecht* alone provides the test for harmlessness. *See Davenport v. MacLaren*, 964 F.3d 448 (6th Cir. 2020), *cert. granted*, *Brown v. Davenport*, — S. Ct. —, No. 20-826, 2021 WL 1240919 (U.S. Apr. 5, 2021). But here we can simply answer his argument on its terms.

The state-court's harmlessness determination was hardly the sort of "extreme malfunction[]" warranting habeas relief. *Harrington*, 562 U.S. at 102. As the state court itself recited in its opinion, the trial record made clear that Bass was the last person to have reported seeing Gunter alive; that he possessed her cellphone and purported to send texts from her after she had died; that Bass similarly told Gunter's cousin that he had been communicating with Gunter after she had died; that Bass also possessed Gunter's car after her death, and gave conflicting

explanations as to how he came to possess it; and that, when police came to Club Celebrity to tow the car, Bass fled in the middle of his shift—leaving behind Gunter's credit card on the pavement not far from the car itself. Moreover, as discussed above, Bass had previously tried to murder one of his former sexual partners in a manner notably similar to the manner in which Gunter was murdered. And meanwhile the rape evidence and mentions thereof comprised only a couple of pages of the transcript of a week-long trial. In short, Bass seriously underestimates the evidence of his guilt and exaggerates the prominence of the rape evidence at trial. His *Brecht* argument is meritless; and for the same reasons his sufficiency claim (based on *Jackson v. Virginia*, 443 U.S. 307 (1979)) is meritless as well.

The district court's judgment is affirmed.