RAMÓN VALENTÍN CRUZ, Petitioner and Appellant, *v.*
EMILIO TORRES MARRERO, ETC., Respondent and Appellee.

No. 12184. Resubmitted May 1, 1958.—Decided June 18, 1958.

452

E. *Alcaraz Casablanca* for appellant. *J. B. Fernández Badillo, Attorney General, Arturo Estrella, Assistant Attorney General, Alfredo Archilla Guenard* and *William Fred Santiago, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

On November 14, 1955, detective Rosario Maurás filed seven complaints against Ramón Valentín Cruz in the District Court, Aguadilla Part, charging separate violations of §§ 1 and 4 of Act No. 26, approved April 25, 1934—33 L.P.R.A. §§ 1851 and 1854—which punishes the making and delivery of checks on banks in which the drawer has not sufficient funds or credit for the payment thereof.[1]

---

[1] "Section 1.—Any person who, for the purpose of defrauding another, makes, extends, endorses, or delivers a check, draft, letter of credit, or order to pay money against any bank or other depositary, knowing at the time of doing so that the maker or drawer has not sufficient funds or credit in said bank or depositary for the total payment of the check, draft, letter of credit, or order upon the presentation thereof, shall be guilty

Except for the respective dates, numbers, and amounts of the checks, the literal content of each complaint in its pertinent reads as follows:

"That on .... and in Aguadilla .... the said defendant, Ramón Valentín Cruz, then and there, unlawfully, wilfully and maliciously, knowingly, and with the criminal intent and criminal purpose of defrauding Luis Oyola Torres, as he actually did . . . drew check number . . . in the sum of . . . signed in his own handwriting, on the Banco Crédito y Ahorro Ponceño, Sucursal de Mayagüez, P. R., to the order of the bearer, which check was returned to him by the said bank for lack of funds. That when the defendant issued that check, he knew that he had no funds. He was duly notified that the check was returned by the bank because he had no funds. On October 18, 1955, Mr. Héctor Reichard, as attorney in representation of the aggrieved party, Luis Oyola Torres, sent defendant a registered letter advising him that on October 10, 1955 he had demanded by telephone payment of the check in question and that the defendant had promised to pay. That on October 11, 1955, at 9:00 a.m., again he demanded personally, in the presence of the warden of the District Jail of Aguadilla, Puerto Rico, and of the complainant, payment of the said amount of money, and that the defendant promised that if he was given an opportunity to go to Mayagüez he would pay him, which opportunity was given him but he failed to pay. That the attorney was only interested in making the defendant pay to the aggrieved party, Luis Oyola Torres, the said amount of money, which he failed

of a misdemeanor and upon conviction, shall be punished by a fine that shall not be less than twice the amount of the said check, draft, letter of credit or order, or by imprisonment in jail for one day for each dollar or fraction thereof he fails to pay, or by both penalties, in the discretion of the court.

"Section 4.—No person shall be punished under this Act unless it is proved to the satisfaction of the court that the *holder* of the check, draft, letter of credit, or order, *or his agent*, has personally notified the drawer or endorser *to pay to the holder or to his agent at the address to be specified on the notice*, the amount of the check, draft, letter of credit, or order within a term of not less than ten (10) days, if the drawer or endorser to whom the notice is directed resides in the locality of the holder, and not less than fifteen (15) days if he resides in another municipality of the island. Said term shall be computed from the date of the notice to the drawer or endorser of the unpaid draft, check, letter of credit, or order. (Italics ours.)

to do. The attorney waited 20 days after sending the registered letter to the defendant. The check was seized and it is introduced in evidence in the Hon. Court of Aguadilla, Puerto Rico, together with a copy of the registered letter."

On December 16, 1955, the seven cases were jointly tried before district judge Juan B. Zamora. A private prosecuting attorney represented The People. The defendant was represented by counsel. At the opening of the trial, a motion was made verbally requesting the disqualification of the judge because of his kinship to the aggrieved party's attorney. The motion was overruled. The cases were submitted and the judge found Ramón Valentín Cruz guilty and sentenced him to pay seven fines totalling $6,064.08, or in default thereof to serve one day in jail for each dollar he failed to pay, such penalty not to exceed 90 days in each case.[2]

Defendant appealed in all cases to the Superior Court, Aguadilla Part. On April 23, 1956, the court dismissed the appeals on the ground that notice of appeal was not served on the private prosecuting attorney who acted in the district court.

On May 25, 1956, Ramón Valentín Cruz filed in the Superior Court, Aguadilla Part, a petition for habeas corpus against Emilio Torres Marrero, Acting Warden of the District Jail of Aguadilla, alleging that he was illegally imprisoned and deprived of his freedom for the following reasons:

"(a) Because the petitioner was sentenced by the District Court of Puerto Rico, Aguadilla Part, by means of a proceeding in open violation of the Constitution of the Commonwealth of Puerto Rico, inasmuch as he did not have an impartial and fair trial because the judge who took cognizance of those cases was related within the third degree of consanguinity to one of the attorneys interested in the action against the petitioner; and it appears from the record that the petitioner suffered

---

[2] The seven checks involved in the cases totalled $3,032.04.

persecution, his original incarceration having been ordered and a bond required in violation of the law and before the slightest possibility of probable cause could exist.

"(b) Because the commission of a public offense by defendant was not established at the trial of the cases against the petitioner."

The writ was issued. The hearing of the petition was held on July 13, 1956, presiding Judge Herminio Rodríguez Quiñones. On August 17, the court rendered judgment denying the petition in the following terms:

"In view of the evidence introduced at the trial of this case, and after listening to the magnetophonic recording of the case in the lower court, and the testimony given at the trial on the causes set forth in the initial petition having been considered as well as the decisions in *Ex parte Lebrón*, 16 P.R.R. 629; *Ex parte Sánchez*, 18 P.R.R. 175; *Ex parte Huertas et al.*, 22 P.R.R. 489; *Hernández v. Meléndez*, 42 P.R.R. 327; *People v. Burgos*, 18 P.R.R. 72; and *Ex parte Le Hardy*, 17 P.R.R. 985, the petition for habeas corpus is hereby denied, and consequently, the petitioner, Ramón Valentín Cruz, is returned to the District Jail of Aguadilla where he will serve the sentences referred to in the said petition."

The petitioner appealed from that judgment. In his brief, he maintains that the court below committed two errors: first, in not allowing him to introduce evidence to the effect that he was deprived of an impartial and fair trial; and, second, in holding that the evidence was sufficient at law to convict him in the district court.

Appellant maintains that the Superior Court, Aguadilla Part, did not allow him to introduce evidence in support of averment "(a)" of his petition, in which he alleged that "he did not have an impartial and fair trial" in the District Court, Aguadilla Part."

At the opening of the hearing of the petition for habeas corpus, the prosecuting attorney moved for its dismissal on the ground that habeas corpus did not lie to review the errors of procedure assigned in the petition. After arguing the propriety of the petition, the judge ruled in favor of the

prosecuting attorney as to averment "(a)" of the petition and against him as to averment "(b)", and decided to consider only whether at the trial "it was not proved that the petitioner had committed a public offense." Consequently, the lower court did not allow the petitioner to introduce evidence in support of his contention that he did not have an impartial and fair trial in the district court, and that "he suffered persecution."

A careful examination of the entire record of the case discloses the existence of a series of facts, of which we deem advisable to set forth the following:

1. On October 10, 1955, Ramón Valentín Cruz was arrested in Mayagüez and conducted and committed to the District Jail of Aguadilla by detective Rosario Maurás, where he was held until the next day [3] without the previous determination of probable cause by a magistrate. [4]

2. He was required to pay the seven checks by Lic. Héctor Reichard, attorney for Oyola Torres, on October 10, 1955, while he was illegally detained by Maurás in the office of the prosecuting attorney of Mayagüez; on the 11th of that month, while he was illegally imprisoned in Aguadilla; and on the 18th, also of the same month, by registered letter, [5] without establishing or attempting to establish at any time at the only trial held in the District Court, Aguadilla Part, that

[3] It is not known how many more days he remained in confinement. The warden gave him permission to go out on October 11 because he had promised Lic. Reichard that he would go to Mayagüez to get the money to pay the amount of the checks. There he did not take any steps to obtain the money, but gave a bond for $5,000. Notwithstanding the bond given, the detective again took him to the Aguadilla jail on the said day of October 11 and shortly thereafter he was released. (Valentín Cruz testified at the trial that the promise to obtain the money was an excuse to leave the jail and give the bond.)

[4] The cases were submitted to the District Judge of Aguadilla on November 14—45 days later—and it seems that the determination of the existence of probable cause was made that day.

[5] The said letter reads as follows:

"Registered Mail—Return Receipt Requested—October 18, 1955—Mr. Ramón Valentín Cruz—24 Prolongación Roosevelt Street—Mayagüez, P. R.

on the three occasions or on any one of them in which he was required to pay, Oyola Torres or his attorney was the holder or possessor of all or part of those checks. Oyola Torres never endorsed or presented the checks for collection. The latter testified that he had cashed them for money belonging to the Corona Brewing Co. This was the entity that deposited the checks in its account in a Santurce bank.

3. He was again arrested on November 21, 1955, by virtue of a warrant of arrest which was not signed by a magistrate.

4. He was tried (1) without having been given copies of the complaints filed against him by the detective, despite the fact that the trial had been continued once for that reason; (2) without having been arraigned; and (3) without being allowed to make any negative averment.

---

—My dear Friend: Pursuant to Section 4 of Act No. 26, 1934, I wish to advise you, in my capacity as representative for Luis Oyola Torres, that if within fifteen (15) days after receipt hereof you fail to pay the amount of the checks listed below, we will proceed as provided by law. The checks are as follows:

| Check number | Date | Amount |
| --- | --- | --- |
| 1268 | Sept. 26/55 | $361.50 |
| 1269 | Sept. 27/55 | $900.00 |
| 1271 | Sept. 28/55 | $777.15 |
| 1273 | Sept. 29/55 | $215.89 |
| 1275 | Sept. 30/55 | $225.87 |
| 1276 | Oct. 1/55 | $269.75 |
| 1279 | Oct. 3/55 | $281.88 |
| | Total........... | $3,032.04 |

(All drawn on the Banco Crédito y Ahorro Ponceño.)

"I wish to remind you that on October 10, I demanded payment of these amounts by telephone, which you answered from the office of Lic. Moreda, prosecuting attorney of Mayagüez, and that you promised to pay. On October 11, 1955, at 9:00 a.m., I again demanded payment of the said checks in the presence of the Warden of the District Jail of Aguadilla and of detective Maurás, and you promised to pay if given an opportunity to go to Mayagüez, and that you were given such opportunity. You went to Mayagüez but did not pay. My only interest in this case is that you pay this money to my client, Luis Oyola Torres.—Very truly yours, (s) Héctor Reichard.—HR/cer."

5. He was tried, convicted, and sentenced by a judge who was an uncle of the attorney for the presumptive aggrieved party Oyola Torres, despite the fact that, prior to the opening of the trial and as soon as appellant's attorney learned of that kinship, he moved for his disqualification on that ground. In each complaint it was stated that that attorney—a nephew of the judge—was the person who had required the defendant to pay the checks. The legal validity of the demand made by the attorney and nephew had to be determined in each case by the judge and uncle.[6]

At the trial of the habeas corpus the petitioner was not allowed to prove: (1) that it was customary for the judge to disqualify himself in all cases in which his nephew acted as attorney; (2) that his nephew, in representation of Oyola Torres, was prosecuting an action of debt against the defendant; and (3) that that attorney was present at the trial of the cases in the district court, assisting the private prosecuting attorney.

6. He was sentenced in case No. 55–2237 for drawing check No. 1269 for $900 on September 27, 1955, despite the

---

[6] The following appears from the record:

"Lic. Alcaraz: A civil action of debt, involving the same facts, was filed in the Superior Court of Aguadilla by Lic. Héctor Reichard. According to information and belief, Your Honor, here is a copy of the complaint subscribed by Lic. Reichard and the order signed by Judge Willis Ramos Vázquez. According to information—I say information because we do not know whether it is so or not—Your Honor is a relative of colleague Héctor Reichard; we do not know whether this is true or not. But if such is the situation, and it also appearing from the complaints that colleague Héctor Reichard intervened in these cases, if that is the situation, we move for the disqualification of the Hon. Judge to act in these cases.

"(Judge): Well . . . the court says that he is the uncle of Héctor Reichard, but that this motion is belated and that Héctor Reichard has nothing to do with the criminal action. The civil action being independent, the judge does not disqualify himself, decides not to disqualify himself in this case."

While the attorney for the defense was arguing the grounds for disqualification, he was interrupted by the judge who said to him: "We are wasting time."

fact that the evidence for the prosecution showed that on that date the defendant deposited in the bank drawn the sum of $1,575, and that the check for $900 could have been cashed out of the sum so deposited if it had been timely presented.

7. He was sentenced in the seven cases upon the essential testimony of an employee of the bank, whose name did not appear in the complaints, notwithstanding the fact that objection was timely made on the ground of surprise.[7]

8. He was jointly tried in the seven cases without his consenting thereto personally or by his attorney.[8]

9. In the habeas corpus proceeding before the Superior Court, he was deprived of his right to present evidence in support of his contention that he had been "sentenced by the district court . . . in a proceeding in open violation of the Constitution of the Commonwealth of Puerto Rico, inasmuch as he did not have an impartial and fair trial . . . ," and that he ". . . suffered persecution. . . ."

The court below, in its brief judgment, stated that it had "listened to the magnetophonic recording of the case in the

---

[7] Notwithstanding the objection of defendant's attorney, the district judge, without deciding it, allowed the main witness to testify.

[8] Considering as a whole the evidence introduced by both parties in the district court, there arises a conflict as to the ends and purposes for which the checks were drawn, delivered, and cashed. That conflict was resolved against the defendant.

Oyola Torres and Valentín Cruz were friends. The former worked as executive of the Aguadilla office of the Corona Brewing Corporation, and the latter as a mere employee of the Coca Cola Bottling Co. in that city. Their respective places of work were very close. The appellant resided in Mayagüez, and he carried a current account with the Banco Crédito y Ahorro Ponceño, Mayagüez Branch. During the months of September and October 1955, the petitioner drew some 30 or 40 checks on the said bank, all of them to the order of "cash," totalling about $10,000. Oyola Torres cashed those checks with money belonging to his employer, Corona Brewing Corporation, and thereafter, without endorsing them, he would send them to his employer, which endorsed and deposited them in its account in The Chase Manhattan Bank, Santurce Branch. The checks were honored, except the last seven listed in the letter of demand copied in footnote 5.

lower court," and also that it had considered "the testimony given at the trial on the causes set forth in the initial petition."

The six cases of this Supreme Court which were cited therein uphold the principle that the purpose of a habeas corpus proceeding is not the same as that of an appeal or certiorari, and that it cannot be invoked to review errors and irregularities. Since the habeas corpus proceeding was established in Puerto Rico,[9] this Court, notwithstanding the laxity with which it has granted such writs, has refused to issue them to correct questions of fact or of law except of a jurisdictional character or in cases of violations of constitutional or statutory rights [10] entailing the nullity of the judgment.

---

According to Oyola Torres's testimony, his friend Ramón Valentín Cruz would go to him and "ask him to cash the checks," which he did out of the money belonging to Corona Brewing Corporation which he had on hand. In his defense, Valentín Cruz testified that it was Oyola Torres who would go to him and asked him to draw the checks in order to facilitate the remittance of funds to the Corona Brewing Corporation; that Oyola Torres, as a general rule, delivered to him the amount of each check, that he drew the check, and thereafter deposited that amount in the bank; that there was such a close friendship between them that sometimes, he, Valentín Cruz, signed blank checks and Oyola Torres would fill them out later; that, as to the last seven checks, Oyola Torres did not deliver any money to him and, hence, they could not be cashed. (It is to be noted that the last seven checks were drawn on consecutive work days.)

[9] See General Order No. 71 of 1899; Circular Letter No. 17 of July 3, 1899; § 35 of the Foraker Act of April 12, 1900; §§ 469–500 of the Code of Criminal Procedure of 1902; § 48 of the Jones Act of March 2, 1917; Act No. 600, known as "Puerto Rican Federal Relations Act" of July 3, 1950; and Arts. II(13) and V(5) of our Constitution.

[10] *Ex parte Mauleón*, 4 P.R.R. 119 (1903)—if pursuant to the law then in force the defendant waived the right to a trial by jury; *Ex parte Soldini*, 4 P.R.R. 159 (1903)—if the mere fear of being confined is sufficient for his confession; *Ex parte Torres*, 4 P.R.R. 285 (1903)—when the defendant by a simple motion may seek adequate relief; *Ex parte Cintrón et al.*, 5 P.R.R. 87 (1904)—error because of variance between the testimony given in the initial proceedings and that given at the trial; *Ex parte Bird*, 5 P.R.R. 241 (1904)—the legality or illegality of the appointment of the trial judge; *Ex parte Rosa*, 8 P.R.R. 125 (1904)—review of the proceedings and evidence to determine the guilt or innocence of the

When there has been a previous conviction, a habeas corpus proceeding constitutes a collateral attack on the judgment. It is true that the regularity of the proceedings which culminated in the judgment is presumed; but the original jurisdiction of a trial court may be lost or exceeded in the course of those proceedings and the same may become void if the defendant's constitutional guarantees are violated. The modern judicial tendency favors the broadening of the scope of inquiry in the habeas corpus in order to preserve the constitutional safeguards of human liberty.[11]

---

defendant; *People* v. *Muñoz*, 8 P.R.R. 404 (1905)—defect of form of a warrant of arrest; *Ex parte Llera*, 11 P.R.R. 409 (1906)—mere errors in warrant of commitment; *Ex parte Pesquera*, 17 P.R.R. 706 (1911)—review of acts constituting contempt; *Ex parte Le Hardy*, 17 P.R.R. 985 (1911)—the legality or illegality of decision punishing a father who has disobeyed an order on the custody of his children; *Ex parte Burgos*, 18 P.R.R. 72 (1912)—consideration of plea of former jeopardy alleged and decided by the lower court; *Ex parte Sánchez*, 18 P.R.R. 175 (1912)—challenging validity of judgment rendered by a court other than that in which grand larceny was committed; *Ex parte Plata*, 22 P.R.R. 175 (1915)—if the absence, during the trial, of the secretary and the marshal invalidate the proceeding; *Ex parte Alers*, 22 P.R.R. 288 (1915)—whether the testimony of an accomplice was sufficiently corroborated; *Ex parte Colón*, 34 P.R.R. 84 (1925)—whether the sentence imposed was excessive within statutory limits; *Medina* v. *Géigel*, 44 P.R.R. 529 (1933)—whether the expiration of the term to file amended complaint was fatal; *González* v. *Saldaña, Warden*, 58 P.R.R. 859 (1941), and *Veguilla* v. *Saldaña, Warden*, 58 P.R.R. 877 (1941)—the propriety of the defense of prescription; *Dones* v. *Saldaña*, 60 P.R.R. 177 (1942)—the character of concurrence of a judgment appealed from; *López* v. *Saldaña*, 60 P.R.R. 304 (1942)—continuance of the trial; *Ex parte Ferrá*, 61 P.R.R. 389 (1943)—petitioner's innocence or guilt; *Morales* v. *Saldaña*, 63 P.R.R. 57 (1944)—the lack of real and effective privation of assistance of counsel; *Vázquez* v. *Rivera*, 70 P.R.R. 203 (1949)—contention which does not constitute attack on the validity of the judgment; *González* v. *Warden*, 79 P.R.R. 41 (1956) —erroneous weighing of the evidence.

[11] Citing in part the case of *Johnson* v. *Zerbst*, 304 U.S. 458, in *Ex parte Hernández*, 54 P.R.R. 396, 402 (1939), we said:

"In answer to the objection that habeas corpus cannot be used as a proceedings to review errors and irregularities committed during the trial, the Supreme Court stated as follows:

" ' . . . True, habeas corpus cannot be used as a means of reviewing errors of law and irregularities . . . occurring during the course of trial; and the "writ of habeas corpus cannot be used as a

The court below, after listening to the magnetophonic recording and considering "the testimony given at the trial on the causes set forth in the initial petition," denied the petition for habeas corpus, holding implicitly that it involved mere irregularities of procedure which were not reviewable in such habeas corpus.

We are not agreed with the judgment of the court below. It is true that some of the errors committed by the district court do not constitute sufficient legal ground to invalidate the judgments rendered against Ramón Valentín Cruz; but it is also true that other gross errors were committed which render all the judgments void. Let us see.

■■■ The lack of previous determination of probable cause for the arrest made on October 10, 1955 and again on November 21, 1955, by virtue of a warrant which was not signed by a judge, converted his detentions into two illegal arrests;[12] however, they did not constitute cause to order his release by virtue of a habeas corpus proceeding after giving bonds and having been tried and convicted in the seven cases.[13] The fact that the district court allowed the

---

writ of error." These principles, however, must be construed and applied so as to preserve—not destroy—constitutional safeguards of human life and liberty. The scope of inquiry in habeas corpus proceedings has been broadened—not narrowed—since the adoption of the Sixth Amendment. In such a proceeding, "it would be clearly erroneous to confine the inquiry to the proceeding and judgment of the trial court" and the petitioned court has "power to inquire with regard to the jurisdiction of the inferior court, either in respect to the subject matter or to the person even if such inquiry . . . (involves) an examination of facts outside of, but not inconsistent with, the record." ' (Citations)."

See Ferris, "The Law of Extraordinary Remedies" 40–41; 25 Am. Jur., Habeas Corpus § 49; 39 C.J.S., Habeas Corpus § 21; and Jiménez v. Jones, 74 P.R.R. 240 (1953).

[12] People v. Soto, 71 P.R.R. 776 (1950); People v. Decós, 62 P.R.R. 140 (1943); Ex parte Colón, 8 P.R.R. 328 (1905); § 25 of the Code of Criminal Procedure.

[13] Jackson v. Warden of the Maryland Penitentiary, 125 A.2d 840, 841 (1956).

witness whose name did not appear in the complaints to testify, was a question of admission of evidence which came within the sound discretion of the court, and the defendant cross-examined that witness at length. Although he alleged surprise, he did not establish its existence or showed that he was not prepared to confront that witness; neither did he move for a continuance of the trial.[14] The fact that the seven complaints were heard jointly on the merits was due to the implied consent of defendant's attorney by failing to move for separate trials when the private prosecuting attorney asked him whether "he wanted separate trials or shall we stipulate that the seven cases be heard jointly and on the same evidence," whereupon they were tried jointly.

■■ The variance or discrepancy pointed out by the petitioner between the allegations of the complaint and the facts proved by the evidence for The People, to the effect that the complaint mentions Luis Oyola Torres as the person defrauded while the evidence shows that the money from which the seven checks were cashed belonged to Corona Brewing Corporation, is not material. Those checks were made out "cash." The essential elements of the offense defined by Act No. 26 of 1934, which must be established (together with the indispensable demand of payment required by § 4), are: (1) the making, extending, endorsing, or delivery of a check, draft, letter of credit, or order on a bank for the payment of money; (2) the knowledge, in doing so, that the drawer or issuer has not sufficient funds to pay; and (3) the intent to defraud. Under this statute, the technical ownership of the money obtained with the intent to defraud is immaterial. The law does not require that

[14] *People* v. *Dones*, 56 P.R.R. 201 (1940); *People* v. *Avilés*, 50 P.R.R. 505 (1936); *People* v. *Egipciaco*, 49 P.R.R. 398 (1936); *People* v. *Pagán*, 47 P.R.R. 635 (1934); *People* v. *Pérez*, 46 P.R.R. 743 (1934); *People* v. *Ayala*, 38 P.R.R. 378 (1928); *People* v. *Román*, 18 P.R.R. 217 (1912).

464

there be an intent to defraud a particular person or that such person be named.[15]

■ On the other hand, we believe that the following errors were committed invalidating the seven judgments rendered against the petitioner:

1. The failure to establish that on the respective dates of the three demands to make payment Luis Oyola Torres was the holder of the checks or the agent for such holder, and that the respective notices specified the address where payment was to be made to the holder or to his agent.

The statute involved in these cases is clear and conclusive on this point:

"*No person shall be punished under this Act* unless it is proved to the satisfaction of the court that the *holder* of the check . . . has personally notified the drawer . . . . to pay *to the holder or to his agent at the address to be specified in the notice,* the amount of the check. . . ." [16]

The complaints did not specify the name or names of the holder or holders of the checks, nor the name or names of the agent or agents of those holders. The only written notice

---

[15] *State* v. *Pilling,* 53 Wash. 464, 102 Pac. 230 (1909). In *People* v. *Cuevas,* 54 P.R.R. 286, 288 (1939), it was held that the statute "makes it an essential element or requisite of the offense [gist] that the making, endorsing or delivering of the check be made with the intent to defraud another person." *Cf. People* v. *Oster,* 129 Cal. App.2d 688, 278 P.2d 39 (1955).

[16] In the *Cuevas* case *supra,* after holding that the intent to defraud was "a requisite or essential element of the offense," it was said at p. 290:

"We do not agree with the interpretation which the prosecuting attorney gives to the legal provisions which we have just copied. The clear and evident purpose of Section 4, *supra,* is to provide a proceeding to prove *a posteriori,* that is, by subsequent facts, the intention or purpose that the maker of a check without funds had in mind when he issued and delivered it to another person. As the intent or purpose with which an act is done is a subjective function and as such impossible to prove objectively, the legislator found it necessary to set forth rules of evidence in view of which the judge can make deductions or reach conclusions against the accused, basing them on the latter's conduct or statements when he issued the check as well

presented in evidence did not state it either. The oral evidence likewise failed to establish it.

The failure to comply with this condition precedent and jurisdictional requirement left the court without judicial power to punish the petitioner. Where the power to punish is wanting, every incarceration or imprisonment is illegal. Where for the purpose of a conviction an essential link in the chain is totally destroyed and there is no possibility of such conviction, a writ of habeas corpus will lie.[17]

2. The failure to deliver to the petitioner separate copies of the complaints constituted a violation of his constitutional right "to be informed of the nature and cause of the accusation and to have a copy thereof." [18] (Actual waiver of this constitutional right does not appear from the record.)

3. The failure to arraign the defendant for seven complaints or to give an opportunity to the petitioner or to his attorney to make a proper plea before trial, con-

---

as after having been notified of the fact that the check had been rejected. In this way, according to Section 2, *supra*, when a check is made and delivered and the drawee refuses to pay it for lack of funds, from these facts the presumption *juris tantum* arises that the drawer of the check knew at the time he made it that it would not be paid. To protect those persons who have issued a check believing in good faith that they had sufficient funds for its payment, the act (Section 4, *supra*) gives the drawer a term of not less than ten days, from the date on which he is notified of the non-payment, to pay the amount of the check. And if the drawer allows the term to run without recovering the check, then the revocable presumption shall arise against him that when he issued the check he intended to defraud his creditor (Section 5, *supra*)."

[17] *Ex parte Salvá*, 41 P.R.R. 27 (1930); *Gandía* v. *People*, 29 P.R.R. 101, 106–07 (1921). *Cf. In re Steward*, 2 Cal. App. 2d 252, 37 P.2d 699; *In re Meisner*, 30 Cal. App.2d 290, 86 P.2d 124; *Ex parte Griffin*, 257 Pac. 458 (Cal. 1927).

[18] Article II, § 11, Constitution of the Commonwealth of Puerto Rico. The Organic Act of 1917 merely granted the right "to have a copy thereof." Our Constitution makes the delivery compulsory without its request being necessary.

stituted a violation of his constitutional right not to be deprived of his liberty without the due process of law.[19]

The Superior Court, Aguadilla Part, did not allow the petitioner to introduce evidence on the incident of disqualification of the district judge. Regarding his contention that he did not have an impartial and fair trial, it was pertinent to inquire into the close family relationship of uncle and nephew existing between the trial judge and the attorney for the presumptive aggrieved party. The attorney had participated as such in representation of Oyola Torres in order to make the demand expressly required by the statute. As already stated, the validity of that demand was a question for the judge. The latter had to consider, and in fact he did, the question of admissibility of the letter of October 18, 1955, written by his nephew. He admitted it over the objections of defendant's attorney. For the purposes of conviction, he considered the demand completely valid despite the fact that it was fatally defective. *Cf.* 50 A.L.R. 2d 143–170.

The district judge himself characterized his family relationship to the attorney as an "anomaly." But he elected to adjudicate because he considered the motion for disqualification "untimely," notwithstanding the fact that the defendant's attorney informed him that he had learned of their relationship the very day of the trial.

The superior judge should not have rejected the evidence offered by the petitioner for the purpose of showing: (1) that the attorney, a nephew of the trial judge, was present at the

---

[19] Article II, §§ 7 and 11, of the same Constitution; §§ 28 and 29 of the Code of Criminal Procedure, 34 L.P.R.A. §§ 58, 59; *People* v. *Colón*, 70 P.R.R. 756, 761 (1950), in which we said:

"Under the preceding precepts it is imperative to arraign a defendant, although, of course, that right may be waived. And here such waiver does not appear.

"The right of the defendant to enter the proper plea, whether of not guilty or guilty, as well as to have a speedy and public trial, are part of the due process of law. . . ."

trial sitting next to the private prosecuting attorney; (2) that the trial judge usually disqualified himself to act in any case in which his nephew appeared in his courts as attorney for any of the parties; and (3) that there was pending a civil action between the presumptive aggrieved party and the petitioner, for the recovery of the amount of the checks in question, of which the judge had knowledge and in which his nephew represented Oyola Torres.

The prosecuting attorney takes the position before this Court that "the judge was not bound to disqualify himself, because his relationship to Lic. Reichard is within the third degree," citing the cases of *People* v. *Berenguer*, 59 P.R.R. 79 (1941); *Laíno* v. *Blondet*, 27 P.R.R. 321 (1919); *Ayala* v. *Maryland Casualty Co.*, 47 P.R.R. 345 (1934); and § 23 of the Code of Civil Procedure, which specifies the cases in which a judge *cannot* act as such, among others, in a judicial action or proceeding in which the judge is related by consanguinity to the attorney of any of the parties within the fourth degree.[20]

---

[20] The original text of this section did not include as a cause for disqualification the relationship of the judge to the attorney for any of the parties. When it was amended by Act No. 19 of May 20, 1921 (Sess. Laws, p. 152), this relationship was included in the causes for compulsory disqualification, limiting the same to the second degree of consanguinity or affinity between the judge and the attorneys for the parties, and including the case in which the judge has been prosecuting attorney in an investigation or criminal proceeding in which the facts involved are the same as those in the action submitted to him for consideration. Possibly, the cases of *Gandía* v. *Stubbe*, 29 P.R.R. 141 and 148, decided in March of that year, brought about the amendment made by Act No. 19 *supra*.

Section 23 was copied from § 59 of the Idaho Code of Civil Procedure of 1881, which in turn was copied from § 170 of the California Code of Civil Procedure. The Idaho section remains unchanged. California, however, has amended its § 170 in the years 1893, 1897, 1901, 1905, 1915, 1921, 1925, 1927, 1929, 1933, 1937, 1939, 1941, 1951, and 1957, to include successively all kinds of relations by which a judge may be linked by personal, pecuniary, or class, or family interest, to the parties to the action, to the subject matter of the litigation or to its results, and even to include also the judge's previous personal knowledge of the facts of the case. Regarding the relationship between the judge and the attorneys, the prohibition to act extends to the third degree of consanguinity or affinity, which is the existing relationship in the case at bar.

468

None of the three cases supports the prosecuting attorney's contention. Technically, his position is correct since it is founded on the provisions of § 23, viewing the situation isolatedly and in the light of strict law. It was up to the conscience of the judge to decide whether, notwithstanding the fact that he was linked by family ties to the attorney for the presumptive aggrieved party, his mind was completely free from bias and prejudice and open to consider and weigh the pleadings and the evidence for the defense.[21]

It is the duty of the judge to see that the scale for weighing the rights of a citizen is exactly on the pointer, and to assist, more than anyone else, in maintaining the courts free from any suspicion of partiality. The term "due process of law" does not mean an infallible process of law,[22] but the denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice.[23]

 Since the seven judgments rendered against the petitioner by the District Court, Aguadilla Section, are wholly void for failure to comply strictly with the condition precedent required by § 4 of Act No. 26 of 1934 to punish defendant, and also, since he was deprived of his constitutional and statutory rights mentioned, such nullity is reviewable in a habeas corpus proceeding. *Jiménez* v. *Jones, supra.*

The length of this opinion is due, partly, to our firm determination to reject, condemn, and eliminate from the administration of justice in Puerto Rico incidents, circumstances, acts, and events such as those which occurred in those seven cases, or analogous to them, which constitute a violation or contempt of the rights sanctioned by our Constitution or granted by our statutes to every citizen. We

---

[21] *Rivera* v. *District Court,* 71 P.R.R. 893 (1950) ; *Garcia* v. *District Court,* 50 P.R.R. 671 (1936) ; *Peña* v. *Garcia,* 45 P.R.R. 42.

[22] *Schechtman* v. *Foster,* 172 F.2d 339, 341 (C.A. 2 1949) (Learned Hand, C.J.).

[23] *Lisenba* v. *California,* 314 U.S. 219, 236 (Roberts) (1941).

have enumerated in the course of this opinion such errors as in our opinion are fundamental and which are sufficient at law to invalidate the seven judgments. The record reveals that a few other errors were manifestly committed which, although not so important, yet their cumulative effect is undesirable. Those errors concern judges, prosecuting attorneys, attorneys, court secretaries, wardens of jails, and detectives. They must not be repeated because the faith of the people in justice, as an essential value of democracy, should be scrupulously preserved at the highest levels of public responsibility by all those who in some way participate in its administration.

The judgment rendered by the Superior Court, Aguadilla Part, on August 17, 1956, will be reversed, and all the judgments rendered on December 16, 1955 by the District Court, Aguadilla Part, against Ramón Valentín Cruz in cases 55-2231, 55-2232, 55-2233, 55-2234, 55-2235, 55-2236, and 55-2237, are hereby declared null and void, setting the petitioner free, and cancelling the bond furnished pending the prosecution of the habeas corpus.

