**Carlton D. RICHARDSON, Petitioner,**

v.

**Larry LACK, etc., et al., Respondents.**

**Civ. A. No. 3:88–0109.**

United States District Court,
M.D. Tennessee.

March 2, 1988.

Opinion on the Merits July 27, 1988.

Margaret M. Huff, Aaron Wycoff, Nashville, Tenn., for petitioner.

Jerry Smith, Charles E. Bush, Atty. General's Office, Nashville, Tenn., for respondents.

## MEMORANDUM OPINION AND ORDER

NEESE, Senior District Judge.

The petitioner Mr. Carlton D. Richardson applied *pro se* for the federal writ of habeas corpus, claiming he is in the custody of the respondent-warden pursuant to the judgment of conviction of May 23, 1983 of the Criminal Court of Tennessee for its 22nd judicial district (encompassing Maury County) in violation of the federal Constitution, Sixth Amendment, Right to Compulsory Process Clause; and Fourteenth Amendment, § 1, Right to the Due Process of the Law Clause. 28 U.S.C. §§ 2241(c)(3), 2254(a). He claims he has exhausted his available state-remedies by having presented fairly his claims herein to the Court of Criminal Appeals of Tennessee and the Supreme Court of Tennessee, 28 U.S.C. § 2254(b).

Mr. Richardson claims that his federal right to the due process of law was violated when:

1. the prosecution used perjured testimony against him during his trial;

2. the prosecution failed to disclose information favorable to his defense; and

3. he was required to participate in a tainted "show-up" for identification-purposes.

"No State shall * * * deprive any person of * * * liberty * * * without due process of law * * *." Constitution, Fourteenth Amendment. " * * * 'A fair trial in a fair tribunal is a basic requirement of due process.' * * * " *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642[3], 6 L.Ed.2d 751 (1961). Furthermore, suppression by the prosecution of evidence favorable to an accused upon request violates due process where evidence is material either to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 104, 83 S.Ct. 1194, 1196–1197[3], 10 L.Ed.2d 215 (1963).

Mr. Richardson claims also that his federal right to compulsory process was violated when his trial-Court refused to allow a witness on his behalf to testify. "In all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor * * *." Constitution, Sixth Amendment.

As it does not appear plainly on preliminary consideration of the face of the applicant's petition that he is not now entitled to relief in this Court, Rule 4, Rules—§ 2254 Cases, it hereby is

ORDERED that the respondent-warden file an answer in accordance with Rule 5, Rules—§ 2254 Cases, within 23 days herefrom, and that a copy of the petition herein and of this order be served forthwith by the clerk of this Court by certified-mail on the respondent-warden and the attorney-general and reporter of Tennessee. Rule 4, Rules—§ 2254 Cases. The noticed slow movement of the mail provides good cause for the additional time allowed. 28 U.S.C. § 2243; Rule 81(a)(2), F.R.Civ.P.

Should it be the respondent's contention that the petitioner has not exhausted his available state-remedies, he may limit his answer to such issue, in which event the Court will consider first the exhaustion-matter, and thereafter will allow the respondent additional time in which to file a supplemental answer, addressing the merits of the petition, as may be indicated.

## ON THE MERITS

The respondent answered, *see* order herein of March 2, 1988. It appearing that no evidentiary hearing is required, the Court makes "such disposition of the petition as justice shall require." Rule 8, Rules —§ 2254 Cases.

The pertinent historic facts herein, stated by the Court of Criminal Appeals of Tennessee, follow:

"The defendant, Carlton Daryl Richardson, was convicted of aggravated rape of a 15–year–old girl and sentenced to 30 years imprisonment. * * * On the morning of August 3, 1983, the 15–year–old victim was at the home of her parents in a rural section of Maury County [, Tennessee]. Her grandmother was in bed recovering from a heart attack. Her father was at a point on their farm north of the house, using a gas-powered weedeater. The child's mother was away cleaning the home of the victim's grandmother.

"At some time * * * [about] * * * 10:00 and 11:00 that morning, as the victim was taking clothes into the house from the clothesline, she saw a man sitting on the carport steps. He told her that he needed to use the telephone and asked her if she were home alone. She told him that she was alone and was not allowed to let anyone in the house. She then opened the screen door and went inside. However, the man grabbed the door, prevented her from shutting it and followed her into the house. She went into the kitchen and pointed to the telephone but the man did not use the telephone. He told her that he had been waiting for her. The man instructed her not to scream and came toward her. He pushed her to the floor, put his hand over her mouth, tore her clothing, unzipped his pants and inserted his penis into her vagina. The man did not remove his clothing. The victim was wearing a jumpsuit with short pants. He tore the bottom of her jumpsuit but did not remove it. The victim was not sure whether the man ejaculated.

"After the man left, the victim continued to lie on the floor for a short time. She went to the bathroom and placed her

bloody underpants in some water. She then telephoned her mother and told her of the attack. The mother estimated the time of the call as being * * * [between] 10:15 and 10:30 A.M. When the victim's father and mother entered the house, they saw that the victim's jumpsuit was torn and that she was bleeding and hysterical. When she had partly calmed, she tried to give her father a description of the rapist. She told him that she had never seen her assailant before.[1]

"At 11:04 A.M., Mr. Guy Porter, Criminal Investigator from the Maury County [, Tennessee] Sheriff's Department, was notified by telephone. By the time that Mr. Porter arrived at the victim's residence, she had calmed sufficiently to give him a description of the man who attacked her. She described him as a young white male—not the 'hippie type.' She described his hair as being similar to hers, not dark and not blonde. She stated that his face was 'rough,' and that 'there might be acne marks on his face.' He was wearing extremely faded bluejeans that were too large for him and had no shirt. Due to the victim's hysteria, the description was given in 'sketches.' Based on this description, Officer Porter investigated the area for suspects.[2]

"Early that same afternoon the victim met with Detective Don Rose, who made a composite drawing of the rapist with the victim's assistance. The victim described the attacker to Detective Rose as being of medium build, with sandy hair and a 'rough' face. Detective Rose testified that the victim was satisfied with his composite drawing except for his depiction of the rapist's hairstyle. Rose drew the hair as being cut straight across the front in bangs whereas the victim described the hair as being swept across and down to the eyebrow. The hairstyle on the composite drawing was never changed to the victim's satisfaction.

"Before the composite drawing was completed, Officer Porter went to the Joe Richardson house, which adjoins the victim's parents' farm to the south, and saw the defendant. He observed that the defen-dant was wearing clothes matching the victim's description. When Porter returned to the victim's residence and saw the composite picture drawn by Rose, he concluded that the defendant was the rapist. Porter, accompanied by Officer Rose, returned to the Joe Richardson farm for the defendant. The victim's father also recognized the drawing as depicting the defendant and so commented. The victim testified at a suppression hearing that she did not hear anyone mention the defendant's name as the rapist.

"Before the composite photograph was completed, Reserve Deputy Sheriff Fred Shelton arrived with a bloodhound. Before reaching the victim's residence, he observed that numerous people were in the yard so he did not take the dog into the yard. Shelton started circling the dog (Blackjack) about 100 yards north of the house in a westerly direction. The victim's house is on the east side of the road. The dog picked up a track approximately 300 yards south of the victim's residence on the west side of the road at a creek near the south end of a small field or garden spot. The scent was picked up by Blackjack about the 'length of this courtroom' west of the road. Shelton knew that he had a 'back trail' because he saw a footprint at the creek pointing in the opposite direction from which Blackjack was tracking. The dog followed this trail to the residence of the defendant's grandmother, Mrs. Alvie Richardson. The dog then followed a trail to the residence of the defendant's uncle, Joe Richardson, which was on the east side of the road and adjoining the victim's farm to the south. The dog went upon the front porch and 'dug at the screen.' Shelton had to pull Blackjack away from the screen door. He returned to the victim's farm and resumed his circle of the residence. When he reached a point directly to the rear of the victim's residence and about 'twice the length of the courtroom' from it, Blackjack struck another trail. The dog continued south along 'visual tracks,' where the weeds had been trampled. That trail led back to the Joe Richardson house (south of the victim's house).

"Officers Porter and Rose were leaving the Joe Richardson driveway with the defendant in an unmarked police car and stopped near Shelton and Blackjack. The dog attempted to get into the car. The police car continued to the victim's residence and the dog pulled Shelton after the car. Shelton and the dog did not arrive at the victim's residence until after the defendant had been taken out of and was put back into the police car.

"At the victim's residence, the defendant was directed to get out of the car and stand in front of the victim. She became hysterical when she saw the defendant and cried out to not let him hurt her. Immediately thereafter, her father attempted to attack the defendant. While the defendant was placed back into the police car, Blackjack arrived and attempted to attack the defendant.

"The victim positively identified the defendant at trial.

" * * * [T]here was semen on [the] defendant's underpants. There was no semen on the victim. * * * [T]he victim's panties were bloody and were washed by her and * * * she also washed her vaginal area with a washcloth before telephoning her mother about the attack.

"Dr. Hartman, who examined the victim at the hospital on the day of the crime, testified that he found a recent tear of her vaginal opening, as well as a tender area on her head.[3] It was his opinion that the victim was not sexually active prior to the rape and that penetration had probably occurred.

"The defendant * * * testified that on the morning of the crime he was with his grandmother, Mrs. Alvie Richardson, a part of the time and performed various chores on his grandmother's farm. He stated that he picked tomatoes, picked and shucked some corn, helped his brother with the cows, repaired a fence and other activities.[4] He testified that about 11:30 A.M., he walked to the home of his aunt, Mrs. Joe Richardson, for a 'bush hook.' He was cutting a fence row on the Joe Richardson property from about noon until about 2:00 P.M. He was working on a fence along the

road which was near a 'brown spot' on an unknown exhibit.

"The defendant admitted that his face was 'rough' on the day of the crime. His photograph revealed that his hair was brushed to one side in the manner described by the victim. His general features resemble those depicted in the composite picture prepared by Detective Rose.

"The defendant did not finish high school because he had some problems. * * * [A]fter 19 months or so in the Navy, he was asked to leave because of an inability to adjust to life in the service. * * * [H]e had no automobile and walked everywhere he went.

"The grandmother and aunt of the defendant testified in support of his alibi defense * * * [and] made statements contradictory to their trial testimony."

"[1] The defendant was 7 years older than the victim. Before quitting school and going into the military service, the defendant lived with his grandmother, Mrs. Alvie Richardson, whose farm was across the road from that of the victim's parents. From the time that the victim was 6 years old until she was about 9 years old, she rode the schoolbus with the defendant. She testified that he had changed drastically since 'she was little' and she did not recognize him on the day the crime was committed as anyone she had ever seen.

"[2] There was a white pickup truck in the area on that morning which was determined to have been driven by Flo Fleming, who was handing out campaign cards. There was also a road crew working in the neighborhood. Officer Porter determined that neither Mr. Fleming nor any of the members of the road crew approximated the description given by the victim.

"[3] She struck her head while falling to the kitchen floor.

"[4] He testified as to where he was during this period. We are unable to follow his testimony because he was apparently using photographic slides which were not in the record and he would point to places on these exhibits. Of course, we have no way of knowing what place he was pointing out."

*State of Tennessee*, appellee, v. *Carlton Daryl Richardson*, appellant, no. 84-16-III, in the Court of Criminal Appeals of Tennessee, op. of March 8, 1985, pp. 1-6. This finding is presumed to be correct, as none of the conditions of sub-§'s (1)-(8), inclusive, is alleged to have been extant with regard to this particular finding.

**I**

Mr. Richardson contends, in substance, that his federal right to the due process of the law was infringed when he was required to participate in an unreliable and tainted one-on-one "show-up." Although "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up, has been widely condemned[ ]," *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), "[t]here is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule, allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time. An early identification is not error. Of course, proof of infirmities and subjective factors, such as hysteria of a witness, can be explored on cross-examination and in argument. Prudent police work would confine these on-the-spot identifications to situations in which possible doubts as to the identification needed to be resolved promptly; absent such need the conventional line-up viewing is the appropriate procedure." *Bates v. United States*, 405 F.2d 1104, 1106[1] (D.C.Cir.1968).

The foregoing recitation of the historic facts herein reflect that the investigation of the crime herein was triggered at 11:04 o'clock, a.m., soon after the crime was committed, and that the "one-man showup" of the petitioner occurred only some four hours afterward. This was "near the time of the alleged criminal act of the" petitioner within the meaning of the decision in the *Bates* case, *supra*.

"It is the likelihood of misidentification which violates a defendant's right to due process * * *." *Neil v. Biggers*, 409 U.S.

188, 198, 93 S.Ct. 375, 381–382, 34 L.Ed.2d 401 (1972). Yet, consideration of the historic facts herein reveals that this identification passes muster under the five-pronged test delineated in that decision, *id.*, 409 U.S. at 199, 93 S.Ct. at 382; they show:

(1) the victim had the opportunity to view the petitioner out-of-doors in the daylight not long before noon at a time when criminal activity was unlikely to have been suspected as well as indoors soon afterward when the commission of the crime began and was completed;

(2) at a time when, it is inferable reasonably, the presence of the petitioner, whom the victim did not recognize as one she had known, outside and inside her home was the main focus of her attention;

(3) the description she first gave investigators of her assailant and his attire as well as that she gave to an artist was accurate to a degree that an investigator and the father of the victim recognized the petitioner therefrom as such assailant; and the victim's description of her attacker's unusual hairstyle was especially significant to her description;

(4) the terrified reaction of the victim upon confronting the petitioner at the "showup" provided strong evidence that her level of certainty that the petitioner was her rapist was very high; and, only about four hours elapsed between the time of the crime and that of the showup.*

That level of certainty is not diminished appreciably by the failure of the victim to have noticed a moustache on her rapist (which was described as "light" and could have been mistaken for his having been unshaven). Neither is it diminished by the failure of the contemporaneous notes taken initially by an investigating officer to have reflected that the victim reported the petitioner was wearing "faded blue jeans"; that he had "brown hair"; and "had acney [sic] spots on face"; and was "not dark, small." Some degree of interpretation must be expected to have been involved in such note taking.

---

* The Court of Criminal Appeals of Tennessee found factually that "[t]he length of time between the crime and the confrontation was ap-

proximately 4 hours." *State of Tennessee*, appellee, v. *Carlton Daryl Richardson*, appellant, *supra*, at p. 23.

From all the foregoing, this Court hereby FINDS that the "one-man showup" to which the petitioner was subjected was not tainted constitutionally.

Mr. Richardson contends, nonetheless, that this Court should consider in that respect the facts, that the trailing bloodhound and the victim's father attempted to attack him, influenced the victim in her identification of him. These attacks occurred after the victim had made her identification and, thus, had no bearing on that issue.

Mr. Richardson contends also that the victim received coercive pressure from the police to identify him, in that she was told to take a quick look at him. This does not amount to coercive pressure.

He contends furthermore that she was influenced by statements made by the investigating officers and her father, that they thought the petitioner might have been the attacker. The Court of Criminal Appeals of Tennessee found that "[t]he victim did not remember hearing these statements but, in any event, at the time she did not know the name of the [petitioner] or what Carlton Richardson looked like." *State of Tennessee*, appellee, v. *Carlton Daryl Richardson*, appellant, *supra*, at p. 21. These contentions, likewise, have no merit. In totality, this Court finds that the showup identification of Mr. Richardson by the victim was reliable constitutionally.

## II

Mr. Richardson asserts also that he was denied the federal due process of the law because: (1) police officers deliberately bypassed a line-up and instead opted for the tainted show-up, and (2) the tainted show-up resulted in a tainted in-court identification. In that this Court has found, *supra*, that the complained-of show-up was not tainted constitutionally, these claims are without merit.

## III

■ Mr. Richardson alleges an additional infringement of his right to federal due process, in that he claims the police officers never told him they were taking him to a show-up but, rather, told him they were taking him to the police station to be questioned. This allegation, even if true, does not state an allegation that goes to the constitutionality of his conviction and, for that reason, is not a ground upon which the relief sought herein may be granted.

## IV

■ Mr. Richardson claims also that his trial Court erred in refusing to admit into evidence drawings made by a professional artist. This claim pertains to an evidentiary issue. "Evidentiary issues do not support a petition under [28 U.S.C.] § 2254 unless the introduction of such evidence violates a specific constitutional provision." *Freeman v. Mabry*, 570 F.2d 813, 814 n. 2 (8th Cir.1978), *cert.den.*, 439 U.S. 845, 99 S.Ct. 142, 58 L.Ed.2d 146 (1978), *citing Spencer v. State of Texas*, 385 U.S. 554, 568–569, 87 S.Ct. 648, 656, 17 L.Ed.2d 606 (1967).

Mr. Richardson asserts that the failure to admit such evidence constituted a violation of his federal-constitutional right to compulsory process and due process of the law. "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it [the Court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial." *Lisenba v. People of California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290[19], 86 L.Ed. 166 (1941), *reh. den.*, 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed. 1222 (1942).

The Court of Criminal Appeals of Tennessee found that:

The artist had taken the composite drawing made by Detective Rose and materially changed the features of the person depicted in the composite. The composite drawing was an outline with appropriate shading to reveal the shape of the head and facial features of the assailant. The artist demonstrated that, by the use of additional shading on the

composite, the shape of the head and all facial features of the assailant could be altered. The artist made these changes by using pastel chalks. She did not use a description or guidance given by the victim in making these alterations but made these several changes by use of her creative imagination.

*State of Tennessee*, appellee, v. *Carlton Daryl Richardson*, appellant, *supra*, p. 25.

█ The failure to allow the admission of this evidence which, as aptly stated by such Court of Criminal Appeals, "would not impeach the testimony of the victim [but] * * * would merely demonstrate the skill and imagination of the artist," in no way infected fatally Mr. Richardson's trial. This claim, thus, is not meritorious.

## V

█ Mr. Richardson claims also that the admission of the so-called "bloodhound evidence" violated his federal rights to the due process of the law and right to confrontation. Tennessee law requires that 5 criteria be met in order to establish a proper foundation for the admission of bloodhound-evidence. *See, State v. Barger*, 612 S.W.2d 485, 491–492 (Tenn.Cr.App.1980).

The record supported the Tennessee Court of Criminal Appeal's finding that these criteria were met. Furthermore, Mr. Shelton was cross-examined at length about the pertinent tracking-procedure employed. Additionally, the trial judge gave the following jury instruction:

Ladies and Gentlemen: You have heard evidence in this trial pertaining to the use of a bloodhound, this is commonly called bloodhound evidence. I caution you that a bloodhound's performances are not infallible, and evidence pertaining to the use of a bloodhound should not be given undue weight, and such evidence alone is not sufficient to convict. I do instruct you that this dog, Black Jack, is properly qualified under the law to trail human beings and the scent of human beings.

Accordingly, the Court finds that Mr. Richardson was not prejudiced unfairly by the introduction of the bloodhound evidence, and his claim in that respect has no merit.

## VI

█ Mr. Richardson claims additionally that his federal due-process rights were denied him, when Deputy Sheriff Shelton committed perjury at his trial. A state prisoner is not entitled to federal habeas corpus relief on the ground that the prosecution used perjured testimony against him at his trial unless the prisoner establishes that the state had knowledge that such testimony was perjured. *Avery v. Procunier*, 750 F.2d 444, 448[2] (5th Cir.1985), *citing Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Pretermitting the claims of the petitioner, that such testimony was infected with perjury, the petitioner has stated no factual allegations whatever which would remotely establish that any prosecuting authority of the state of Tennessee had the slightest knowledge that any part of the testimony of Mr. Shelton was perjured. For that reason, at least, such claim must fail.

## VII

█ Mr. Richardson contends additionally that the state was guilty of prosecutorial misconduct in failing to disclose: (1) evidence that was relevant in regard to the victim's possible lack of virginity, and (2) evidence that the victim's initial description of her assailant was inconsistent with later descriptions.

With regard to the second of those claims, this Court discussed previously the contemporaneous notes of officer Porter. The Court finds they were not material to Mr. Richardson's defense and that there was no misconduct on the part of the prosecution in not disclosing them. Mr. Richardson claims that the prosecution withheld a hospital-report made by the physician who examined the victim after the attack which indicates that her last menstrual period was 6 weeks prior to such attack. He claims that this information would have been of assistance to him in refuting the physician's testimony, that the victim was not sexually active, and that it would have

878

been of assistance in establishing that the victim believed she was pregnant and thus concocted the rape story. The Court finds this evidence was not material on its face as to Mr. Richardson's guilt or to his alibi-defense. *Brady v. Maryland,* 373 U.S. 83, 104, 83 S.Ct. 1194, 1196–1197[3], 10 L.Ed.2d 215 (1963). This claim has no merit.

### VIII

Mr. Richardson claims further that the prosecuting attorney took advantage of the alleged nondisclosures in his closing arguments to the determent of Mr. Richardson. This Court found, *supra,* that Mr. Richardson's claims of nondisclosure on the part of the prosecution had no merit. The instant claim, thus, likewise has no merit.

From all the foregoing, it appears that the petitioner is not incarcerated in violation of his federal constitutional rights, and he hereby is

DENIED all relief. Judgment to that effect will enter. Rule 58(1), F.R.Civ.P.

Should the petitioner give timely notice of an appeal from the judgment to be entered herein, he is authorized to proceed thereon *in forma pauperis.* Rule 24(a), F.R.App.P. Any such notice will be treated also as an application for a certificate of probable-cause, Rule 22(b), F.R.App.P., which WILL issue, because of the complexity of the legal issues implicated herein.