*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ARRON DEMARCUS BOGAN,

      Defendant-Appellant.

UNPUBLISHED
March 17, 2022

No. 355649
Berrien Circuit Court
LC No. 2019-002827-FH

Before: O'BRIEN, P.J., and SHAPIRO and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree home invasion, MCL 750.110a(2), carrying a concealed weapon, MCL 750.227, felon in possession of a firearm, MCL 750.224f, felon in possession of ammunition, MCL 750.224f(6), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced, as a second-offense habitual offender, MCL 769.10, to 106 to 360 months' imprisonment for his first-degree home invasion conviction, 28 to 90 months' imprisonment for his convictions of carrying a concealed weapon, felon in possession of a firearm, and felon in possession of ammunition, and two years' imprisonment for his felony-firearm conviction. We affirm.

## I. BACKGROUND

This case arises out of a July 30, 2019 home invasion in Sodus Township, Michigan. Shortly after the home invasion occurred, an officer in nearby Watervliet effectuated a traffic stop of a Chevrolet Cobalt operated by Warren Clark with defendant sitting in the front passenger seat, and Tony Lee and Danarus Chatwood sitting in the backseat. Incriminating evidence was found inside the vehicle, including a .45-caliber handgun, two BB guns, masks, and latex gloves similar to gloves recovered near the scene of the crime. The vehicle also contained shards of grass similar to tall grass located in a field near the crime scene. Police officers found tire tracks in that grassy field after the home invasion. Footwear impressions recovered from the scene of the home invasion were consistent with defendant's shoes.

In addition, Chatwood testified at defendant's trial pursuant to a plea agreement. Chatwood described how the home invasion occurred, including that Clark carried a .45-caliber gun, that

-1-

defendant and Lee carried BB guns, and that defendant and the three other men entered the house. Chatwood testified that, before the home invasion occurred, Clark displayed and loaded the firearm in front of defendant while they were parked near a river. Chatwood also explained that when the Cobalt was pulled over by the police, Clark handed the .45-caliber gun to defendant, who then put it under his seat. Chatwood was impeached at trial with prior inconsistent statements he had made, including statements made under oath.

In a pretrial motion, defendant challenged the legality of the traffic stop and moved to suppress evidence recovered from the Cobalt, but the trial court denied the motion. In another pretrial motion, defendant sought to exclude Chatwood's testimony, arguing that it would comprise the knowing use of perjured testimony. The trial court denied this request as well. A three-day jury trial was held in the fall of 2020 over defendant's objections to various procedures used to protect against COVID-19. After defendant was convicted and sentenced, this appeal ensued.

## II. MOTION TO SUPPRESS

Defendant first argues that the trial court erred in denying his pretrial motion to suppress evidence seized from the Cobalt. We disagree.

"This Court reviews a trial court's findings at a suppression hearing for clear error." *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). Clear error exists when the reviewing court is definitely and firmly convinced that the trial court made a mistake. *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). Deference is afforded to the trial court's assessment of the credibility of witnesses. *People v Galloway*, 259 Mich App 634, 638; 675 NW2d 883 (2003). This Court reviews de novo whether the Fourth Amendment was violated and whether the trial court's ultimate ruling on the motion to suppress was correct. *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009).

"US Const, Am IV, and Const 1963, art 1, § 11, guarantee the right of the people to be free from unreasonable searches and seizures." *People v Brown*, 279 Mich App 116, 130; 755 NW2d 664 (2008). A traffic stop amounts to a seizure under the Fourth Amendment. *People v Campbell*, 329 Mich App 185, 196; 942 NW2d 51 (2019). If an officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is reasonable and does not violate the Fourth Amendment. *People v Marcus Davis*, 250 Mich App 357, 363; 649 NW2d 94 (2002); *People v Williams*, 472 Mich 308, 314-315; 696 NW2d 636 (2005); *Whren v United States*, 517 US 806, 810; 116 S Ct 1769; 135 L Ed 2d 89 (1996). "Probable cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003) (quotation marks and citation omitted).

Watervliet Police Officer Joshua Allen testified that he effectuated the traffic stop of the Cobalt because he suspected that the driver was operating the vehicle while intoxicated. Officer Allen explained that this suspicion arose after he (1) observed the Cobalt swerve into the center turn lane before Officer Allen's dashboard camera began recording, (2) observed the Cobalt swerving within its own lane, and (3) believed that the Cobalt was speeding down a hill near the edge of town.

The trial court credited Officer Allen's testimony about the Cobalt swerving into the center turn lane before Officer Allen's dashboard camera began recording, but concluded that the swerving did not by itself provide a sufficient basis for concluding that the driver was operating while intoxicated. As for Officer Allen's testimony about the Cobalt's alleged movement within its own lane, the trial court noted that in the dashboard recording of the stop, it was difficult to tell whether the Cobalt swerved enough in its own lane to touch the fog line but that the car certainly did not cross over the fog line. Regardless, like with the Cobalt's swerving into the center lane, the court determined that the Cobalt's movements within its own lane, alone, did not justify the traffic stop.

Nevertheless, crediting Officer Allen's testimony about his observation of the Cobalt speeding, the trial court ruled that the stop was sufficiently justified. The court noted that the dashboard camera footage, which included the Global Positioning System (GPS) speed information, showed the Cobalt traveling in excess of the 30 mile-an-hour limit and pulling away from Officer Allen's vehicle as they went downhill. Although Officer Allen could not see the GPS speed information while he was driving and could not recall whether he looked at his speedometer, the court took note of Officer Allen's extensive experience driving on that road and his perception of the Cobalt speeding as it pulled away from the police vehicle.[1]

On appeal, defendant argues that the only evidence of the Cobalt speeding was the GPS speed information that Officer Allen admittedly did not see before making the stop, that Officer Allen could have used radar equipment or paced the Cobalt using his speedometer but did not, and that Officer Allen's observations about the Cobalt speeding were not sufficient to justify the stop. Contrary to defendant's argument, neither a speed-measurement device nor pacing is necessary to justify a stop for a speeding violation. See *United States v Monzon-Gomez*, 244 F Appx 954, 959 (CA 11, 2007) (explaining that "the Fourth Amendment does not require the use of radar detection to establish probable cause to believe a motorist is speeding"). See also generally *State v Allen*, 978 So 2d 254 (Fla App, 2008) (collecting cases from various jurisdictions supporting the proposition that neither a speed-measurement device nor pacing is necessary to justify a stop for speeding, and that an officer's visual observation of a vehicle traveling at a high rate of speed is adequate).[2] The pertinent issue for assessing the legality of the stop was whether the evidence was sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief that defendant was violating the law—in this case, speeding. Officer Allen's testimony about his observations that the Cobalt was speeding based upon his experience driving on that road and his perception of the Cobalt speeding as it pulled away from Officer Allen's vehicle—testimony that the trial court credited—was sufficient to establish probable cause to believe that defendant was speeding. See *Monzon-Gomez*, 244 F Appx at 959 ("The Fourth Amendment plainly does not prohibit a law enforcement officer from pulling over a motorist for

---

[1] During an exchange with defense counsel, the trial court noted that Officer Allen testified "that he's driven that road thousands of times and believed he was traveling the speed limit based upon that experience, and that so was the car in front of him until it pulled away from him."

[2] "While the decisions of lower federal courts and other state courts are not binding on this Court, they may be considered as persuasive authority." *People v Woodard*, 321 Mich App 377, 385 n 2; 909 NW2d 299 (2017).

suspected speeding whenever the officer is acting solely on the basis of his visual observation."). Accordingly, the trial court did not err in finding that the traffic stop was justified, and it properly denied defendant's motion to suppress evidence.

### III. RIGHT TO FAIR TRIAL IN LIGHT OF COVID-19 PROTOCOLS

Defendant next argues that he was denied a fair trial by the use of certain protocols at trial to protect against COVID-19. We disagree.

Constitutional issues, including the right to a fair trial, are reviewed de novo. *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011).

"Under our state and federal Constitutions, a person cannot be deprived of life, liberty, or property without due process of law." *People v Joly*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354379); slip op at 5, citing Const 1963, art 1, § 17, and US Const, Ams V and XIV, § 1. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955).

> In the context of criminal proceedings, the "denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v California*, 314 US 219, 236; 62 S Ct 280; 86 L Ed 166 (1941). This is a relatively high bar—only if "the absence of that fairness fatally infected" the judicial process will there be a violation of due process. *Id*. In analyzing the issue, courts look to the "totality of the circumstances." *Withrow v Williams*, 507 US 680, 689; 113 S Ct 1745; 123 L Ed 2d 407 (1993). [*Joly*, ___ Mich App at ___; slip op at 5.]

As defendant notes, a fair trial has been described as consisting of "a trial before an impartial judge, an impartial jury, and in an atmosphere of judicial calm." *People v Bigge*, 288 Mich 417, 435; 285 NW 5 (1939) (quotation marks and citation omitted).

At the same time, it must be recognized that a defendant "is entitled to a fair trial but not a perfect one for there are no perfect trials." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008). This principle is worth keeping in mind given that defendant is challenging procedures meant to protect human life during an unprecedented public health crisis. See *Morgan v Bunnell*, 24 F3d 49, 51 (CA 9, 1994) (noting in another context that "a trial judge is charged with the grave responsibility of guarding the safety of courtroom personnel, parties, counsel, jury and audience").

We will now address in turn each of defendant's arguments challenging various procedures implemented at trial to protect against COVID-19.

Defendant contends that he was denied a fair trial by the refusal to allow his family members to be present in the courtroom during the trial. As defendant concedes, he has cited no authority establishing a right to the physical presence of his family in the courtroom. The trial court expressed sympathy for defendant's wish to have his family present to support him and boost his morale, but to protect against the spread of COVID-19 as required by the State Court

-4-

Administrative Office (SCAO),[3] the court was constrained to limit the persons allowed in the courtroom. Only the parties, lawyers, jurors, and witnesses were allowed in the courtroom. The trial was streamed on YouTube, and defendant's family members were free, along with other members of the public, to watch the trial that way.[4]

Defendant next raises a number of complaints related to protocols for jurors, which limited his counsel's ability to observe the jurors' physical responses. First, defendant takes issue with the fact that during voir dire, potential jurors were located in a separate assembly room before being called into the courtroom for voir dire. When defendant raised this issue before the trial court, the court noted that the lawyers were free to go to the assembly room at any point during jury selection if they wished to see the remaining potential jurors who had not yet been called into the courtroom, and the court pointed out that it had also allowed the lawyers to have an assistant or associate present in the assembly room. Defendant fails to explain how these procedures denied him a fair trial. Defendant also complains that jurors were required to wear masks and to maintain safe physical distances between each other during the trial, resulting in some jurors being seated in the portion of the courtroom normally reserved for the audience. Defendant says that his counsel could not observe the jurors throughout the trial to determine if they were paying attention, and it hindered his counsel's ability to assess jurors' responses to the evidence being presented. Defendant, however, provides no authority to dispute the trial court's observation that there is no constitutional right of confrontation with respect to jurors (as opposed to witnesses[5]). Moreover, defendant cites no authority requiring jurors to be unmasked[6] or to all sit together in the jury box rather than to be spread out in the courtroom. In short, defendant has provided no basis to conclude that the implementation of the contested masking and physical-distancing protocols denied him a fair trial.

Defendant next contends that the trial was not marked by a sense of judicial calm. He says that jurors seated in the back of the courtroom had trouble hearing witnesses, especially Chatwood. But the record shows that the trial court endeavored to ensure that jurors could hear the testimony. During the second day of trial, the trial court noted that jurors had been asked if they could hear, and the jurors indicated that they could. When Chatwood later took the stand to testify, the trial court arranged for him to use a microphone and told him to put the microphone under his face shield and up to his mouth so that he could be heard. When jurors indicated difficulty hearing Chatwood, the prosecutor told Chatwood to keep the microphone up and to speak louder, and the court likewise instructed Chatwood to speak loudly. Later, on the third day of trial, a juror noted difficulty hearing Chatwood, and the trial court told Chatwood to "[k]eep that microphone right up to your lip and please speak up, okay?" The record thus shows that the trial court took adequate

---

[3] The trial court noted that all of its COVID-19 procedures had been approved by the SCAO.

[4] Defendant does not argue that he was denied an open trial, and we offer no opinion on the issue.

[5] Witnesses wore face shields rather than masks while testifying so that their faces could be seen.

[6] Defendant also fails to note that a person's eyes and upper face are visible while wearing a mask, and that a mask does not prevent one from observing other parts of a person's demeanor such as their body language. Defendant cites no authority establishing a constitutional right to see jurors' noses and mouths.

measures to ensure that the jurors could hear the testimony. Defendant asserts that there were instances in which jurors had difficulty hearing but failed to inform the trial court, but the record affords no basis for this assertion.

Defendant also cursorily contends that judicial calm did not exist because the first day of trial was held in a different courthouse than the second and third days of trial. No support exists for this contention. The first day of trial was held in the Niles courthouse because there was more physical space there to conduct jury selection with physical distancing. With jury selection having been completed on the first day of trial, the second and third days of trial were held in the trial court's usual courthouse in St. Joseph. Holding jury selection in a separate location with more physical space in an effort to protect health did not disrupt an atmosphere of judicial calm.

Defendant further suggests that judicial calm was absent because an Internet outage occurred in the Niles courthouse during defense counsel's opening statement at the end of the first day of trial, thereby requiring defense counsel to complete his opening statement at the beginning of the second day of trial, which was in the St. Joseph courthouse. When the technological problem occurred during defense counsel's opening statement at the end of the first day of trial, the trial court apologized to defense counsel in the presence of the jury and noted that he could complete his opening statement on the next day of trial. At the beginning of the second day of trial, the trial court explained to the jury that there had been an Internet outage in the entire Niles courthouse the previous day. Defense counsel was then permitted to complete his opening statement. Again, defendant was entitled to a fair trial, not a perfect trial. *Miller*, 482 Mich at 559. The trial court handled this matter fairly and judiciously.

Next, defendant accuses the jurors of deciding this matter hastily because they deliberated for less than an hour.[7] Defendant attributes the jurors' alleged haste to their purportedly being distracted by the threat of COVID-19. Defendant's accusations are unfounded. Absent evidence that the verdict was affected by influences external to the trial proceedings, the sanctity of the jury's deliberative process may not be invaded. *People v Fletcher*, 260 Mich App 531, 539-540; 679 NW2d 127 (2004). Regardless, no indication exists that the jurors were distracted by COVID-19 or that this affected their deliberations. The promptness with which the jurors returned their verdict may simply reflect that they all agreed from the outset of deliberations that the evidence established defendant's guilt beyond a reasonable doubt. Defendant's suggestion that the jurors deliberated with undue haste out of a fear of contracting COVID-19 lacks support.

Defendant also tersely asserts that his right to a speedy trial was violated. Defendant waived review of this issue by failing to include it in his statement of questions presented. *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011). Also, his argument consists of mere cursory assertions. He cites no caselaw setting forth the requirements for establishing a speedy trial claim, and he presents no argument explaining how those requirements are satisfied here. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation

---

[7] On the third day of trial, the jury began deliberating at 3:48 p.m. and returned its verdict at 4:39 p.m.

of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).

Defendant further makes a conclusory assertion that his right to equal protection was violated because the trial court failed to make adequate findings to support the imposition of a cash bail that defendant says he could not afford. With this issue too, defendant waived it by failing to include it in his statement of questions presented, *Fonville*, 291 Mich App at 383, and abandoned it by giving it only cursory treatment and failing to explain why he believes the trial court failed to make adequate findings, *Harris*, 261 Mich App at 50; *Kelly*, 231 Mich App at 640-641.

## IV. PERJURED TESTIMONY

Defendant next argues that the trial court erred in allowing the presentation of Chatwood's allegedly perjured testimony. Defendant's framing of the issue on appeal is somewhat confusing. He challenges the trial court's decision to allow Chatwood's testimony, but defendant's underlying argument is that the prosecutor committed misconduct by presenting the allegedly perjured testimony and that, on this basis, the trial court should have barred Chatwood's testimony. We therefore believe that defendant's central contention is properly understood as a claim of prosecutorial misconduct.

Issues of prosecutorial misconduct are "reviewed de novo to determine whether the defendant was denied a fair and impartial trial." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

This Court has explained:

> It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment. If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. Thus, it is the misconduct's effect on the trial, not the blameworthiness of the prosecutor, which is the crucial inquiry for due process purposes. The entire focus of our analysis must be on the fairness of the trial, not on the prosecutor's or the court's culpability. [*People v Bass*, 317 Mich App 241, 272-273; 893 NW2d 140 (2016) (citation omitted).]

Defendant argues that the prosecutor committed misconduct by knowingly using Chatwood's perjured testimony (and that the trial court erred by allowing the prosecutor to do so). Defendant, however, has failed to establish that Chatwood committed perjury at trial, let alone that the prosecutor knowingly used perjured testimony.

At defendant's trial, Chatwood's testimony was consistent in material respects with testimony he gave at Clark's trial, which was held in early 2020. At both trials, Chatwood admitted

to lying under oath at a previous court hearing. Chatwood testified at both Clark's trial and defendant's trial that Chatwood himself went into the house that was the subject of the home invasion and that he saw both Clark and defendant enter the house. Previously, however, Chatwood had denied entering the house and claimed that he stayed at the car. Although Chatwood testified at both trials that, when they were pulled over in Watervliet, Clark handed the gun to defendant who then put it under his seat, Chatwood had testified at an earlier hearing that Clark himself put the gun under the seat. At defendant's trial, Chatwood testified for the first time that Clark displayed and loaded the gun in front of defendant while they were parked near a river before the home invasion occurred.

At both trials, Chatwood was impeached with his prior inconsistent statements and admitted that he had lied regarding certain matters in an earlier court hearing.[8] This, however, does not by itself establish that Chatwood committed perjury *at Clark's trial or defendant's trial* and that the prosecutor knowingly used perjured testimony. "Although an inconsistent prior statement may be a mechanism to impeach a witness's credibility at trial, it is not definitive evidence that the trial testimony is false." *Bass*, 317 Mich App at 275. The jury at defendant's trial was fully informed of Chatwood's prior inconsistent testimony and statements, and it was the jury's role to determine Chatwood's credibility and the weight of his trial testimony. See *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008) (noting that "[i]t is the jury's task to weigh the evidence and decide which testimony to believe[]" and that this Court "will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses[]") (quotation marks and citation omitted). Although Chatwood provided additional details at defendant's trial that he did not provide at Clark's trial about Clark displaying and loading the gun in front of defendant while they were parked near a river before the home invasion, this could be explained as Chatwood providing additional facts about which he had not previously been asked. It does not necessitate a conclusion that Chatwood committed perjury at either trial. The record does not support defendant's claim that the prosecutor knowingly used perjured testimony.

V. CUMULATIVE ERROR

Finally, defendant argues that the cumulative effect of all of the errors he has raised on appeal entitles him to a new trial. Defendant waived review of this issue by failing to include it in his statement of questions presented. *Fonville*, 291 Mich App at 383. Even so, addressing the argument, it lacks merit. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). As discussed throughout this opinion, defendant has failed to establish that any errors occurred.

---

[8] Chatwood testified at both trials that his false testimony at an earlier hearing was attributable at least in part to threats he had received in jail from defendant or Clark. In addition, Chatwood testified at trial that he lied at the preliminary examination in order to protect defendant, with whom Chatwood once had a close friendship.

"Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*. Defendant's cumulative-error argument is therefore unavailing.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Douglas B. Shapiro
/s/ Mark T. Boonstra